In re TAYLOR & ASSOCIATES,
L.P., Debtor.

Bankruptcy No. 95–33024.

United States Bankruptcy Court,
E.D. Tennessee.

March 8, 1996.

Robert E. Hall, M.D., P.A., Jim Rogers, Sr., Mike Rogers, and Ben F. Rogers.

McKinney & Sharpe, Beverly P. Sharpe, Knoxville, Tennessee, for Petitioning Creditors, Richard E. Gamble, Sr. and Christine M. Gamble.

Ellen B. Vergos, United States Trustee, Region 8, Patricia C. Foster, Knoxville, Tennessee, for United States Trustee.

Bailey, Roberts & Bailey, P.L.L.C., Robert M. Bailey, N. David Roberts, Jr., Knoxville, Tennessee, for William T. Hendon, Interim Trustee.

### MEMORANDUM ON CONTESTED INVOLUNTARY PETITION

RICHARD S. STAIR, Jr., Chief Judge.

On March 1, 1996, the court held a hearing on the contested Involuntary Petition filed by James S. Bush against Taylor & Associates, L.P. on November 13, 1995. The facts giving rise to the contested petition and the court's resolution of the issues before it are discussed below.

This is a core proceeding. 28 U.S.C.A. § 157(b)(2) (West 1993).

I

### HISTORY OF THE CONTESTED PETITION

This involuntary case was initiated under Chapter 7 with the filing of an Involuntary Petition against Taylor & Associates, L.P. on November 13, 1995, by James S. Bush, a creditor asserting a $300,000.00 claim. Pursuant to 11 U.S.C.A. § 303(c) (West 1993), twelve additional creditors subsequently joined the petition: William W. Gilley, asserting a claim of $995,410.00,[1] Jim Rogers, Sr., asserting a claim of $39,105.00, Mike Rogers, asserting a claim of $27,932.00, Ben F. Rogers, asserting a claim of $18,803.00, Richard E. Gamble, Sr., asserting a claim of $15,000.00, and Christine M. Gamble, asserting a claim of $15,000.00, all joined the peti-

Egerton, McAfee, Armistead & Davis, P.C., Stephen A. McSween, Herbert H. Slatery, III, Knoxville, Tennessee, for James S. Bush, Petitioning Creditor.

Taylor Law Firm, David H. Jones, Knoxville, Tennessee, for Dudley W. Taylor.

McCord & Troutman, P.C., C. Mark Troutman, Knoxville, Tennessee, for Petitioning Creditors, Robert E. Hall, individually, Robert E. Hall, M.D., Trustee for Robert E. Hall, M.D., P.A. Money Purchase Pension Plan, Robert E. Hall, M.D., Trustee for Robert E. Hall, M.D., P.A. Defined Benefit Plan,

---

1. Mr. Gilley originally asserted a claim of $1,028,708.00. However, at the March 1, 1996 hearing, he testified that he failed to consider a $33,298.00 payment received from the debtor's general partner, Joseph C. Taylor, on May 23, 1995, and that his claim should be reduced accordingly.

tion on December 15, 1995; Robert E. Hall, M.D., Trustee for Robert E. Hall, M.D., P.A. Money Purchase Pension Plan, asserting a claim in excess of $10,000.00, Robert E. Hall, M.D., Trustee for Robert E. Hall, M.D., P.A. Defined Benefit Plan, asserting a claim in excess of $10,000.00, Robert E. Hall, M.D., P.A., asserting a claim in excess of $10,-000.00, Robert E. Hall, individually, asserting a claim in excess of $10,000.00, and W.T. Mathes, asserting a claim in excess of $70,-000.00, each joined the petition on December 20, 1995;[2] and Johnson and Galyon, Inc., asserting a claim of $1,000,000.00, joined the petition on February 23, 1996.[3]

On December 1, 1995, Dudley W. Taylor filed a Motion to Dismiss Involuntary Petition alleging that the Involuntary Petition should be dismissed because (1) Taylor & Associates, L.P. is not an entity that qualifies as a debtor under 11 U.S.C.A. § 109(b) (West 1993 & Supp.1995); (2) the petitioning creditor, James S. Bush, is not eligible under 11 U.S.C.A. § 303(b) (West 1993 & Supp.1995) to file the Involuntary Petition; (3) this court is an inappropriate forum in which to settle disputes between a debtor and its sole creditor; (4) the Involuntary Petition was filed in bad faith; and (5) pursuant to 11 U.S.C.A. § 305 (West 1993), dismissal is in the best interest of all parties. The original petitioning creditor, James S. Bush, filed a response to Dudley W. Taylor's dismissal motion on December 15, 1995, asserting, *inter alia*, that Dudley W. Taylor lacked standing under the Bankruptcy Code and Rules to contest the Involuntary Petition filed against Taylor & Associates, L.P. In a Memorandum filed January 26, 1996, the court, in denying Dud-

ley W. Taylor's Motion to Dismiss Involuntary Petition, made a number of findings, including that Taylor & Associates, L.P. is a limited partnership under the laws of the State of Tennessee and therefore qualifies as a debtor under the Bankruptcy Code, and that Dudley W. Taylor, who is alleged by James S. Bush to be a general partner of the debtor but who denies the allegation, has standing pursuant to Fed.R.Bankr.P. 1011(a) to contest the Involuntary Petition. *See In re Taylor & Assocs., L.P.*, 191 B.R. 374 (Bankr.E.D.Tenn.1996).[4]

Dudley W. Taylor filed an Answer to Involuntary Petition on January 30, 1996, denying that the petitioners are creditors of Taylor & Associates, L.P. and asserting, with two exceptions, defenses to the Involuntary Petition identical to those set forth in his December 1, 1995 Motion to Dismiss Involuntary Petition. At a scheduling conference held February 8, 1996, the court ruled that under the law of the case doctrine it would not reconsider those matters raised in Dudley W. Taylor's answer that had previously been resolved in disposing of the Motion to Dismiss Involuntary Petition; that pursuant to Fed.R.Bankr.P. 1003(b) Dudley W. Taylor was to file a list of all creditors of Taylor & Associates, L.P. on or before February 23, 1996; and that until the court determined whether the Involuntary Petition would be sustained or dismissed, it would not address a claim asserted by Dudley W. Taylor in his answer that he was entitled to fees, costs, and damages pursuant to 11 U.S.C.A. § 303(i) (West 1993) for the alleged bad faith filing of the Involuntary Petition by the original petitioning creditor, James S. Bush.[5]

---

**2.** W.T. Mathes, in a document filed February 28, 1996, entitled "Withdrawal of Petition," states that he "hereby gives notice of the withdrawal of the Joinder of Petitioner to Involuntary Petition." The court need not address the effect of Mr. Mathes's purported withdrawal on his status as a petitioner.

**3.** The court makes no finding as to the amount of the allowed claim held by any creditor of Taylor & Associates, L.P. The amounts of the claims listed by the petitioning creditors in their joinder petitions and to which they testified at the March 1, 1996 hearing are discussed in this Memorandum only for purposes of determining whether the requirements of § 303 have been satisfied.

**4.** The January 26, 1996 Memorandum is also dispositive of a Motion for Leave to Intervene in Motion to Dismiss Involuntary Petition filed by John F. Miller on December 11, 1995. Mr. Miller, identifying himself in the motion only as an "interested person," sought to intervene in the involuntary case for the purpose of opposing the Involuntary Petition. His motion was denied.

**5.** The court's ruling at the February 8, 1996 scheduling conference is set forth in a transcribed Memorandum Opinion filed February 12, 1996.

Additionally, the court in its February 8, 1996 Memorandum and accompanying Order, directed that a hearing on the contested Involuntary Petition would be held March 1, 1996, and that the contested issues to be resolved are limited to:

> A. Whether at least three (3) of the petitioning creditors hold noncontingent claims not subject to bona fide dispute against Taylor & Associates, L.P. as required by 11 U.S.C. § 303(b);[6] and

> B. Whether pursuant to 11 U.S.C. § 303(h)(1) Taylor & Associates, L.P. "is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute."

On February 23, 1996, Dudley W. Taylor, in compliance with the February 8, 1996 Memorandum and Order, filed a document entitled "Response of Dudley W. Taylor to Court Order Dated February 8, 1996 to Comply with Bankruptcy Rule 1003(b)" (Response).[7] Appended to the Response is a ten-page exhibit labeled "Persons and Entities Who Appear to Have Placed Funds with Joe Taylor for the Purchase of Securities" that contains the names and, in most instances, the addresses of 109 individuals or businesses.[8] In his Response, Dudley W. Taylor states that "there are no creditors of TALP [Taylor & Associates, L.P.] in the event it came into existence as a partnership" and "*if* the original petitioning creditor, James S. Bush . . ., could be deemed a creditor, then there are 12 or more persons or entities similarly situated and they would qualify as creditors *if* Bush is a creditor."

## II

### THE MARCH 1, 1996 HEARING AND ADMISSIBILITY OF STATEMENTS MADE BY JOSEPH C. TAYLOR

The hearing on the contested petition was held March 1, 1996. The court heard testimony from James S. Bush, Robert E. Hall, Jim Rogers, Sr., William W. Gilley, Richard E. Gamble, Sr., Christine M. Gamble, and William T. Hendon, the Interim Trustee appointed November 15, 1995, pursuant to 11 U.S.C.A. § 303(g) (West 1993).[9] Forty-eight exhibits were introduced into evidence. A forty-ninth exhibit, marked Exhibit A, is a Stipulation regarding the authenticity of certain bank records and documents.

During the March 1, 1996 hearing, Dudley W. Taylor's counsel objected to the admissibility of statements made by Joseph C. Taylor that the petitioning creditors sought to introduce through the testimony of each witness, except the Interim Trustee, Mr. Hendon.[10] Dudley W. Taylor's counsel objected on hearsay grounds to the testimony of James S. Bush, the initial witness called to testify by the petitioning creditors. The objection was overruled for reasons stated by the court at the hearing. Counsel for Dudley W. Taylor stated his intention to raise the hearsay objection with respect to the testimony of any witness who repeated statements made by Joseph C. Taylor. The court accordingly allowed Dudley W. Taylor a continuing objection to statements made by Joseph C. Taylor.

Notwithstanding that the court orally explained at the March 1, 1996 hearing the reasons for overruling Dudley W. Taylor's

---

**6.** To be accurately couched in terms of § 303(b), this paragraph should have read: "Whether at least three (3) of the petitioning creditors hold claims 'not contingent as to liability or the subject of a bona fide dispute' as required by 11 U.S.C. § 303(b). . . ."

**7.** Rule 1003(b) requires in material part that "[i]f the answer to an involuntary petition filed by fewer than three creditors avers the existence of 12 or more creditors, the debtor shall file with the answer a list of all creditors with their addresses, a brief statement of the nature of their claims, and the amounts thereof." Fed. R.Bankr.P. 1003(b).

**8.** This exhibit does not contain a statement of the nature or amount of any claim for any listed entity.

**9.** All witnesses were called by the original petitioning creditor, James S. Bush. However, counsel for Dudley W. Taylor advised the court on several occasions that Dudley W. Taylor intended to call the same witnesses during his proof as adverse witnesses but that he would conduct his entire examination during the course of the petitioning creditors' proof to save time.

**10.** It is undisputed that Joseph C. Taylor died on November 3, 1995, from self-inflicted injuries.

hearsay objection, it is appropriate to expand upon that ruling within the context of this Memorandum.

Federal R.Evid. 801 provides in material part:

(a) **Statement.**—A "statement" is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion.

(b) **Declarant.**—A "declarant" is a person who makes a statement.

(c) **Hearsay.**—"Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

(d) **Statements which are not hearsay.**—A statement is not hearsay if—

. . . .

(2) **Admission by party-opponent.**—The statement is offered against a party and is (A) the party's own statement in either an individual or a representative capacity or . . . (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship . . . .

The Sixth Circuit Court of Appeals recently discussed the application of Rule 801(d)(2) under circumstances similar to those presented in this case. *See United States v. Wiedyk,* 71 F.3d 602 (6th Cir.1995). In *Wiedyk,* the defendant, an officer of an employee benefit plan, was convicted for soliciting and receiving kickbacks and making false statements in relation to the plan. The issues on defendant's appeal of his conviction included, among others, whether the district court properly admitted testimony of a witness, Roger Towne, pursuant to Rule 801(d)(2)(D). Roger Towne, an employee of Delaware Professional Services, an organization hired by the employee benefit plan to identify cost-effective providers of medical and laboratory services, testified that his deceased partner, Edward Brown, "had told Towne not to bother searching out more cost-effective providers for lab services for the Fund because defendant was making sure that Metric [the organization from which the defendant re-ceived kickbacks] got the Fund's business." *Id.* at 605.

The Sixth Circuit held that although Mr. Towne's testimony was offered against the party defendant, as required by Rule 801(d)(2)(D), the testimony was not properly admitted under the Rule because the declarant, Edward Brown, was not the defendant's agent or servant when he made the alleged statement. In making this determination, the court discussed the following two ways that the United States could have established an agency relationship between the declarant and the defendant:

First, Brown [the declarant] can be shown to have been an agent for the Fund and defendant's control over the Fund so extensive as to have the Fund's role as principal imputed to defendant. *See, United States v. Paxson,* 861 F.2d 730 (D.C.Cir. 1988). In *Paxson,* statements made by the vice-president of a closely held corporation were admissible under the agency exception to the hearsay rule when the defendant was nominally a "co-employee," but owned the "overwhelming majority of the [corporation's] stock." Defendant Paxson argued that the declarant was a co-employee rather than defendant's agent but the appeals court found that, given the pair's respective relationships to the corporation, an agency relationship was present as between the defendant and the declarant.

Finding the requisite agency relationship by this method of analysis fails in this case, however. . . . Even granting the government's contention that defendant's job title, at the time, of "Office Manager" concealed a greater role at the Fund than the title may imply, defendant by no means could have been regarded as having the breadth of control required for the purposes of determining the existence of an agency relationship by imputing the corporation's status as principal to the corporate employee. . . .

An agency relationship would also be proven if factors which normally make up an agency relationship are present between Brown and defendant, regardless of the corporate structure. In other words, defendant's role in the Fund is neither

conclusive of an agency relationship with Brown nor is his role as corporate employee preclusive of the possibility. . . .

*Paxson*, which the government offers as precedent in this case, differs not only in the fact that the defendant had complete control over the corporation but also the declarant had worked under the defendant for 25 years and reported directly to him. The record discloses no evidence of such an agency relationship between defendant and Brown whether as a matter of duration or as a matter of authority.

*Id.* at 606 (second alteration in original) (citations omitted).

▆▆▆ In the matter presently before this court, the issue of Joseph C. Taylor's status with respect to Taylor & Associates, L.P. is material to understanding the court's resolution of Dudley W. Taylor's hearsay objection. In its Memorandum filed January 26, 1996, disposing of Dudley W. Taylor's Motion to Dismiss Involuntary Petition, the court found that Taylor & Associates, L.P. is a limited partnership under the laws of the State of Tennessee. *See Taylor & Assocs., L.P.,* 191 B.R. at 384–90. This finding was grounded in part on a Certificate of Limited Partnership for Taylor & Associates, L.P., filed with the Tennessee Secretary of State on May 6, 1994. *Id.* at 387. The Taylor & Associates, L.P. Certificate of Limited Partnership, introduced as Exhibit 1 at a November 15, 1995 hearing regarding the appointment of an interim trustee, unambiguously states that "[t]he name and address of the sole general partner [of Taylor & Associates, L.P.] is ... Joseph C. Taylor." The court accordingly finds that Joseph C. Taylor was the general partner of Taylor & Associates, L.P.

At the March 1, 1996 hearing, the petitioning creditors offered statements made by Joseph C. Taylor against the opposing party, as required by Rule 801(d)(2)(D) and as was done in *Wiedyk*. However, in this case, as opposed to *Wiedyk*, the declarant was an agent of the opposing party, i.e., Joseph C. Taylor was the agent of Taylor & Associates, L.P., the opposing party that has answered

and contested the Involuntary Petition through Dudley W. Taylor, an alleged general partner.[11] *See* Tenn.Code Ann. § 61–1–108(a) (1989) ("Every partner is an agent of the partnership for the purpose of its business. . . ."). Furthermore, "declarations of one partner made during the existence of the partnership and in relation to its affairs are admissible against the other partners even if the declarant is not a party to the action." *United States v. Saks,* 964 F.2d 1514, 1524 (5th Cir.1992) (discussing the general rule at common law, as set forth in *Filesi v. United States,* 352 F.2d 339, 342 (4th Cir.1965), which Congress evidently did not depart from when it enacted Rule 801). Based on the foregoing rationale and the reasons stated at the March 1, 1996 hearing, the statements by Joseph C. Taylor offered as evidence against Dudley W. Taylor and Taylor & Associates, L.P. constitute admissible non-hearsay pursuant to Rule 801(d)(2)(D).

## III

### *STATUS OF PETITIONING CREDITORS UNDER 11 U.S.C.A. § 303(b) (WEST 1993 & SUPP.1995)*

Dudley W. Taylor contends that none of the petitioners are creditors of Taylor & Associates, L.P., who hold claims "not contingent as to liability or the subject of a bona fide dispute" as required by Bankruptcy Code § 303(b). Rather, Dudley W. Taylor argues that the petitioners are creditors of Joseph C. Taylor, individually, or of entities operated by Joseph C. Taylor other than Taylor & Associates, L.P. However, there is no evidence in the record before the court to support a finding that Joseph C. Taylor was engaged in or operated any business other than the limited partnership business of Taylor & Associates, L.P. While certain exhibits introduced into evidence contain references to "Joseph C. Taylor & Associates, Inc.," "Joe Taylor & Assoc., L.P.," "Joe Taylor & Assoc.," "Taylor & Assoc.," and the like, these references alone are not sufficient to permit the court to determine the existence

---

11. The Bankruptcy Code and Rules allow "a nonpetitioning general partner, or a person who is alleged to be a general partner but denies the allegation, ... [to] contest the petition." Fed. R.Bankr.P. 1011(a); *see* 11 U.S.C.A. § 303(d) (West 1993).

of any corporate or proprietorship entity operated by Joseph C. Taylor. The court therefore concludes, for purposes of resolving only the issues presently before it, that all such references are to Taylor & Associates, L.P., the debtor.

### A. Analysis of § 303(b)

Bankruptcy Code § 303(b) provides in material part:

(b) An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—

(1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute, or an indenture trustee representing such a holder, if such claims aggregate at least $10,000 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;

(2) if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under section 544, 545, 547, 548, 549, or 724(a) of this title, by one or more of such holders that hold in the aggregate at least $10,000 of such claims . . . .

11 U.S.C.A. § 303(b) (West 1995 & Supp. 1996).

Courts have established various definitions for the phrase "bona fide dispute" as used in § 303(b). *See Sipple v. Atwood (In re Atwood)*, 124 B.R. 402, 407–08 (S.D.Ga.1991), and cases cited therein. The Fifth Circuit, relying on decisions of the Third, Seventh, Eighth, and Tenth Circuits, has characterized a bona fide dispute under an objective standard, which requires a court to " 'determine whether there is an objective basis for either a factual or a legal dispute as to the validity of the debt.' " *Subway Equip. Leasing Corp. v. Sims (In re Sims)*, 994 F.2d 210, 221 (5th Cir.1993) (quoting *Rimell v. Mark Twain Bank (In re Rimell )*, 946 F.2d 1363, 1365 (8th Cir.1991), *cert. denied*, 504 U.S. 941, 112 S.Ct. 2275, 119 L.Ed.2d 202 (1992)), *cert. denied*, — U.S. ——, 114 S.Ct. 702, 126

L.Ed.2d 669 (1994); *see also B.D.W. Assocs., Inc. v. Busy Beaver Bldg. Ctrs., Inc.*, 865 F.2d 65, 66–67 (3d Cir.1989); *Bartmann v. Maverick Tube Corp.*, 853 F.2d 1540, 1544 (10th Cir.1988); *In re Busick*, 831 F.2d 745, 750 (7th Cir.1987). Under this standard, the Fifth Circuit determined that a dispute in only the amount of the claim does not rise to the level of a bona fide dispute. *Sims*, 994 F.2d at 221 (finding that creditors' failure to mitigate would only reduce the amount of their claims and "would not constitute a substantial factual or legal question bearing on the debtors' liability"). Numerous other courts have found that where only a portion of the claim is subject to a bona fide dispute, the undisputed portion is sufficient to support the creditor's standing to file or join in an involuntary petition pursuant to § 303(b). *IBM Credit Corp. v. Compuhouse Sys., Inc.*, 179 B.R. 474, 479 (W.D.Pa.1995) (Where at least $22,000.00 of a $153,000.00 claim was not subject to bona fide dispute, "the undisputed portion [was] sufficient to create a debt under Section 303(b)(1) not subject to a bona fide dispute."); *In re Fox*, 162 B.R. 729, 732 (Bankr.E.D.Va.1993) ("A bona fide dispute must exist as to the validity of an entire claim and not merely a portion of the claim."); *In re Willow Lake Partners II, L.P.*, 156 B.R. 638, 642–43 (Bankr.W.D.Mo. 1993) ("[A] creditor will have standing to commence an involuntary case, even though a portion of the creditor's claim is the subject of a bona fide dispute, where the undisputed portion of the claim is not contingent as to liability.").

Dudley Taylor argued during closing arguments at the March 1, 1996 hearing that based on *In re Owens*, 151 B.R. 865 (Bankr. E.D.Tenn.1992), a creditor may not join in an involuntary petition if a portion of its claim is subject to bona fide dispute. Dudley Taylor has mischaracterized the holding of *Owens*. This court, speaking through Judge Kelley, stated in *Owens:*

Some disputes may be so minor that they should not protect the debtor from involuntary bankruptcy. On the other hand, the court does not agree with an absolute rule that the entire claim must be in dispute. The statute does not say that the entire

claim must be i[n] dispute. In some cases a rule that the entire claim must be disputed would frustrate the purpose of the statute. Whether a claim is subject to a bona fide dispute is a matter of degree. The courts will have to work out the rules by deciding individual cases.

The court will not attempt to draw a definite line or make a definition. Suffice it to say that in this case the creditors' claims under the sale contract are subject to substantial bona fide disputes that prevent the claims from being used to force the Owens into bankruptcy.

*Id.* at 869 (citations and footnote omitted). *Owens* only supports the argument that under certain circumstances, a creditor will be barred from forcing a debtor into bankruptcy if a material portion of the creditor's claim is subject to substantial bona fide dispute.

 In this case, the exact amount of certain creditors' claims cannot be determined based on the evidence presented at the March 1, 1996 hearing. Certain creditors may hold claims for less or more than the amounts included in their joinder petitions. However, based on the evidence hereinafter discussed, more than three of the petitioning creditors hold valid, material claims against Taylor & Associates, L.P.; and therefore, the court finds that under the circumstances present in this case, evidence of a dispute as to the exact amount of certain creditors' claims is insufficient to support Dudley Taylor's argument that the petitioning creditors hold claims subject to bona fide dispute.

The phrase "claim ... not contingent as to liability" must also be defined in order to determine whether the requirements of § 303(b) have been satisfied in this case. Dudley Taylor relies on the following definition of a contingent claim:

[C]laims are contingent as to liability if the debt is one which the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event which will trigger the liability of the debtor to the alleged creditor and if such triggering event or occurrence was one reasonably contemplated by the debtor and creditor at

the time the event giving rise to the claim occurred.

*In re All Media Properties, Inc.,* 5 B.R. 126, 133 (Bankr.S.D.Tex.1980), *aff'd per curiam,* 646 F.2d 193 (5th Cir.1981). Based on this definition and the classification of unadjudicated tort claims as contingent by numerous courts, Dudley Taylor argues in his brief filed February 26, 1996, that James Bush's claim for investment fraud is contingent because "there must at some point be a determination made as to whether the fraud was committed." *See id.* at 133 ("In the case of a tort claim for negligence, the parties at the time of the alleged negligent act would be presumed to have contemplated that the alleged tort feasor would be liable only if it were so established by a competent tribunal. Such a tort claim is contingent as to liability until a final judgment is entered fixing the rights of the parties."); *Still v. Hudson (In re Hudson),* 28 B.R. 876 (Bankr.E.D.Tenn.1983).

Dudley Taylor has presumed that the petitioning creditors' claims sound in tort. On the joinder petitions, the creditors have described the nature of their claims as "investment fraud," "theft of funds," "investment," "monies owed," "debt," and "breach of contract." The evidence presented at the March 1, 1996 hearing establishes that the majority of the petitioning creditors were induced by Joseph C. Taylor to invest in a limited partnership expecting high returns on proposed purchases of bonds, stocks, and stock options. The proposed investments were never made, and cancelled checks presented at the March 1, 1996 hearing evidence that Joseph Taylor fraudulently converted the creditors' funds. Based on these facts, the petitioning creditors' claims arise from a tort or contract action against Taylor & Associates, L.P. *See Semel v. Dill (In re Dill),* 731 F.2d 629, 631 (9th Cir.1984).

A claim is contingent under the *All Media Properties'* definition if the triggering of "liability" by "the occurrence or happening of an extrinsic event" has not occurred. 5 B.R. at 133. The term "liability" is not the equivalent of a judgment or remedy. *In re Longhorn 1979–II Drilling Program,* 32 B.R. 923, 927 (Bankr.W.D.Okla.1983). To hold other-

wise would make the term "contingent" synonymous with the term "liquidated." *See Black's Law Dictionary* 930 (6th ed.1990) (defining liquidated as "[a]scertained; determined; fixed; settled; ... made certain as to what and how much is due" (citations omitted)). Rather, liability is "only a condition of being obligated to answer for a claim." *Longhorn 1979–II Drilling Program,* 32 B.R. at 927. Under this definition of liability, the court in *Longhorn* provides the following explanation regarding a determination of whether an unadjudicated tort claim is contingent:

> [T]here is liability when all the elements required for a claim under [§ 101(5)(A) ] are in existence and all the underlying events have accrued. So long as all the facts which give rise to the tort action have occurred the claim is accrued and there is no contingency as to liability in the bankruptcy sense.

We think that the term "accrued" in the bankruptcy sense takes on the same meaning as with reference to a cause of action in ordinary litigation. For our purposes, therefore, "accrued" means becoming complete so that the aggrieved party can begin and prosecute his action. The claim is accrued at the moment the plaintiff could have first maintained an action or, stated otherwise, when he would be entitled to institute a judicial proceeding for enforcement of his rights. In tort actions a claim accrues on the date when the tort is committed, the date on which there arose wrongful invasion of personal or property rights, or when the person injured acquires a present right to sue. Thus, a tort claim accrues at the moment the course of events is first sufficiently ripe for suit. Lack of judgment does not affect the tort claim so as to make it contingent, but the judgment concerns only enforceability and payment of the claim. The contingency is whether the creditor will obtain a judgment, not whether he has a claim sufficient for an involuntary petition.

. . . .

Liability in connection with the phrase "contingent as to liability" must be construed narrowly as a state of circumstances where one is bound in law to do, pay, or make good something which can be enforced by legal action. When all the events have occurred which allow a court to adjudicate a claim and determine whether or not payment should be made, there is no contingency concerning the claim itself. The contingency is applicable only to payment and is only a condition of payment. This logic applies impartially to actions which sound in tort as well as contractual obligations.

*Id.* at 927–28 (citations and footnote omitted); *see McNeil v. United States Fidelity & Guar. Co. (In re McNeil),* 13 B.R. 434, 436 (E.D.Tenn.1981) (rejecting debtor's argument that indemnity claim must be reduced to judgment in order to be noncontingent). *Compare In re Elsub Corp.,* 66 B.R. 172, 176–88 (Bankr.D.N.J.1986) (distinguishing contingency as to liability from contingency as to payment) *and In re B.D. Int'l Discount Corp.,* 13 B.R. 635, 638 (Bankr.S.D.N.Y.1981) (concluding that claim "for money had and received or resulting from a bailment" was noncontingent although state court action sounded in tort) *with In re Elsub Corp.,* 70 B.R. 797, 808 (Bankr.D.N.J.1987) (concluding that claims based on discriminatory conduct, wrongful discharge, and personal injury were contingent because the claims were not fixed by a judgment and required proof of liability).

The Sixth Circuit has discussed the term "noncontingent" as used in Bankruptcy Code § 109(e), which establishes Chapter 13 eligibility.[12] *Comprehensive Accounting Corp. v. Pearson (In re Pearson),* 773 F.2d 751 (6th

---

12. Section 109(e) provides:
 Only an individual with regular income that owes, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts of less than $250,000 and noncontingent, liquidated, secured debts of less than $750,000, or an individual with regular income and such individual's spouse, except a stockbroker or a commodity broker, that owe, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts that aggregate less than $250,000 and noncontingent, liquidated, secured debts of less than $750,000 may be a debtor under chapter 13 of this title.
 11 U.S.C.A. § 109(e) (West Supp.1995).

Cir.1985). In making a determination of whether debts exceeding the statutory limits for Chapter 13 eligibility were noncontingent, liquidated, and unsecured under § 109(e), the Sixth Circuit in *Pearson* relied on the diversity jurisdiction standard, which is best explained in *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 58 S.Ct. 586, 82 L.Ed. 845 (1938):

> "The rule governing dismissal for want of jurisdiction in cases brought in the federal court is that, unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal. The inability of plaintiff to recover an amount adequate to give the court jurisdiction does not show his bad faith or oust the jurisdiction. Nor does the fact that the complaint discloses the existence of a valid defense to the claim. But if, from the face of the pleadings, it is apparent, to a legal certainty, that the plaintiff cannot recover the amount claimed[,] or if, from the proofs, the court is satisfied to a like certainty that the plaintiff never was entitled to recover that amount, and that his claim was therefore colorable for the purpose of conferring jurisdiction, the suit will be dismissed. Events occurring subsequent to the institution of suit which reduce the amount recoverable below the statutory limit do not oust jurisdiction."

*Pearson*, 773 F.2d at 757 (6th Cir.1985) (alteration in original) (quoting *St. Paul Mercury Indem. Co.*, 303 U.S. at 288–90, 58 S.Ct. at 590–91 (footnotes omitted)). This court, in applying § 109(e) under the standards set forth in *Pearson*, has determined that "[a] debt is not contingent or unliquidated merely because it is disputed." *In re Hutchens*, 69 B.R. 806, 811 n. 9 (Bankr.E.D.Tenn.1987).

Some courts are hesitant to rely on the same definition of contingent for purposes of applying § 109(e) and § 303(b). One court has concluded that the phrase "noncontingent ... debts" in § 109(e) is distinct from the phrase "a claim ... not contingent as to liability" in § 303(b). *In re Ramus*, 37 B.R. 723, 726 n. 2 (Bankr.N.D.Ga.1984); *see Pearson*, 773 F.2d at 755 (discussing *In re Lambert*, 43 B.R. 913, 918 (Bankr.D.Utah 1984)). The court in *Ramus* distinguished the two phrases based on the following analysis:

> While much helpful case law interpretation of "noncontingent" has been made under the *commencement of the involuntary case standard*, significantly, it is the *"debt"* that must be noncontingent under § 109(e) rather than merely the *"claim"* as under § 303(b)(1). The definitional section of the Code provides a different meaning for the terms "debt" and "claim": a "debt" is a ["]liability on a claim." § 101(4), (11) [now § 101(5), (12) ]. The broad definition of a "claim" in the Code provides justification for the *Longhorn* court to find that the debtor's tortious liability predicated upon a "claim" was noncontingent.... [However,] where the tortious liability is predicated upon a "debt" (and, therefore, *liability* must be present), a different conclusion, namely that the debt is contingent, is warranted.

37 B.R. at 726 n. 2; *see Lambert*, 43 B.R. at 918–19. The interpretation of Chapter 13 eligibility requirements also invokes policies that differ from those under which the involuntary bankruptcy provisions must be applied. Accordingly, application of the term "noncontingent" under § 109(e) and the term "contingent as to liability" under § 303(b) may result in differing conclusions. However, the Supreme Court advises:

> Statutory construction ... is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme—because the same terminology is used elsewhere in a context that makes its meaning clear, or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988) (citations omitted). The court, therefore, will consider the Sixth Circuit's § 109(e) standard in establishing an appropriate definition for the phrase "claim ... not contingent as to liability" under § 303(b).

Based on the *Longhorn* analysis of the definition of a claim contingent as to liability and the Sixth Circuit's discussion of noncontingent claims in *Pearson*, this court adopts the following standard for determining whether a claim is contingent as to liability under § 303(b): "When all the events have occurred which allow a court to adjudicate a claim and determine whether or not payment should be made, there is no contingency concerning the claim itself," unless "it is apparent, to a legal certainty," that the petitioning creditor would be unable to obtain a judgment against the debtor upon adjudication of its claim. *Longhorn 1979–II Drilling Program*, 32 B.R. at 927; *Pearson*, 773 F.2d at 757. Under the foregoing § 303(b) standard, the court finds that the evidence presented by the parties at the March 1, 1996 hearing hereinafter discussed establishes that the petitioning creditors' claims are noncontingent as to liability to the extent they are based on unadjudicated contract and tort actions against Taylor & Associates, L.P.

■■■ Dudley W. Taylor, relying on numerous cases, also argues that if the petitioning creditors are deemed to be limited partners, their claims are more properly classified as capital contributions, not a "right to payment" or "right to an equitable remedy for breach of performance" held against Taylor & Associates, L.P. 11 U.S.C.A. § 101(5) (West 1993). Courts generally agree that limited partners are not creditors of the partnership solely by virtue of their partnership interests. *In re Riverside–Linden Inv. Co.*, 85 B.R. 107, 112–13 (Bankr.S.D.Cal.1988), *aff'd*, 99 B.R. 439 (9th Cir. BAP 1989), *aff'd*, 925 F.2d 320 (9th Cir.1991); *Broadview Sav. Bank v. Royal Gate Assocs., Ltd. (In re Royal Gate Assocs., Ltd.)*, 81 B.R. 165, 167 (Bankr.M.D.Ga.1988). However, the petitioning creditors in this case assert claims against Taylor & Associates, L.P. based on accrued tort and contract actions; therefore, this case is distinguishable from the foregoing cases in which courts concluded that limited partners were not creditors of the partnership. *See Dill*, 731 F.2d at 631; *In re St. Charles Preservation*

*Investors, Ltd.*, 112 B.R. 469, 474–75 (D.C.), *appeal dismissed*, 916 F.2d 727 (D.C.Cir. 1990); *Longhorn 1979–II Drilling Program*, 32 B.R. at 925–29. Moreover, the plain language of the Bankruptcy Code supports the court's finding that alleged limited partners holding claims based on accrued tort and contract actions are creditors of the partnership. A claim is defined by the Bankruptcy Code as, among other things, a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." § 101(5)(A). An alleged right to payment based on a tort or contract claim clearly falls within this definition. The court finds that regardless of whether the petitioning creditors in this case are limited partners, they are creditors holding claims against the partnership.

### B. Analysis of the Evidence

The court will discuss the testimony of each petitioning creditor who testified at the March 1, 1996 hearing on the contested Involuntary Petition.

#### 1. James S. Bush

The court finds from the testimony of James S. Bush that Mr. Bush is the president and owns a controlling interest in Johnson and Galyon, Inc.; that on October 16, 1995, Mr. Bush had conversations with Joseph C. Taylor who advised him of investment opportunities through Taylor & Associates, L.P. in a municipal bond issue; and that Mr. Taylor[13] told him the bonds would be called on November 1, 1995, and asked if he would care to invest through Taylor & Associates, L.P. Johnson and Galyon invested $1,000,000.00 from a line of credit at Third National Bank. Pursuant to wiring instructions received from Mr. Taylor or his administrative assistant, Sherry Seay, by fax on October 18, 1995, Mr. Bush wired the Johnson and Galyon, Inc. funds "to the account of Taylor & Associates, LP[,] Account No. 3101040685" in NationsBank of Nashville, Tennessee. The funds were deposited into

---

**13.** All future references in this Memorandum to "Mr. Taylor" or "Taylor" are references to Joseph C. Taylor. Dudley W. Taylor will be referred to exclusively as "Dudley W. Taylor."

the Taylor & Associates, L.P. NationsBank account.

Mr. Bush was subsequently called by Taylor about an investment opportunity regarding the purchase of stock options in First American National Bank. Taylor also sought this investment through Taylor & Associates, L.P. On October 30, 1995, Mr. Bush purchased a cashier's check in the amount of $300,000.00 from First Knoxville Bank, payable to himself, which he delivered to Mr. Taylor. This check was endorsed by Mr. Bush payable to the order of Taylor & Associates. The check was thereafter endorsed by Joseph C. Taylor on behalf of Taylor & Associates, L.P. and deposited into the Taylor & Associates, L.P. account at Nations-Bank.

Mr. Bush received no confirmation from Taylor & Associates, L.P. or Joseph Taylor of either the $1,000,000.00 received from Johnson and Galyon, Inc. or the $300,000.00 received from Mr. Bush, individually, nor did either Johnson and Galyon, Inc. or Mr. Bush receive any bonds or stock options. As of November 13, 1995, the date the Involuntary Petition was filed against Taylor & Associates, L.P., the debtor owed Johnson and Galyon, Inc. $1,000,000.00 and James S. Bush $300,000.00.

The court finds that the claims of Johnson and Galyon, Inc. and James S. Bush are represented by the checks given by Mr. Bush to Joseph C. Taylor; that they are not contingent as to liability or the subject of a bona fide dispute; and that they are claims owed by the debtor, Taylor & Associates, L.P.

### 2. Robert E. Hall

Robert E. Hall, an ophthalmologist, testified that he invested with Taylor & Associates, L.P. under four separate entities: as Trustee of a Money Purchase Pension Plan, individually, through Robert E. Hall, M.D., P.A., his professional corporation, and as Trustee of a Defined Benefit Plan. Dr. Hall is the sole Trustee of the Money Purchase Pension Plan and the Defined Benefit Plan and the sole shareholder of his professional corporation. Dr. Hall testified he purchased insurance from Joseph C. Taylor five to eight years ago and that Taylor approached him on behalf of Taylor & Associates, L.P. in August 1994.

### a. Money Purchase Pension Plan

Dr. Hall testified that Taylor approached him with a "bond deal" in August 1994 and represented to Dr. Hall that his associates in the banking and bond business permitted him to acquire municipal bonds that would mature within thirty days. Dr. Hall wrote checks payable to Taylor & Associates, L.P. dated August 23, 1994, in the amount of $436,000.00, November 7, 1994, in the amount of $160,000.00, November 15, 1994, in the amount of $290,000.00, November 21, 1994, in the amount of $250,000.00, December 2, 1994, in the amount of $600,000.00, February 3, 1995, in the amount of $50,000.00, August 9, 1995, in the amount of $1,000,000.00, and October 16, 1995, in the amount of $500,-000.00.

Joseph C. Taylor, through checks written on Taylor & Associates, L.P. accounts in NBC Knoxville Bank and NationsBank issued the following checks payable to Dr. Hall's Money Purchase Pension Plan: check dated November 7, 1994, in the amount of $173,913.04, check dated November 7, 1994, in the amount of $610,889.65, check dated July 23, 1995, in the amount of $570,000.00,[14] check dated July 24, 1995, in the amount of $570,000.00,[15] check dated July 18, 1995, payable to Spartan Money Market account in the amount of $3,437.00 and deposited into Dr. Hall's account, and check dated October 18, 1995, in the amount of $44,583.00.

Mr. Taylor represented to Dr. Hall that all monies given to Taylor & Associates, L.P. would be used to acquire municipal bonds, stock, or options in First American National Bank or First National Bank of Gatlinburg. Dr. Hall did not, however, receive confirmation of any transactions nor did he receive any stock or options.

---

**14.** The month in which this check was written cannot be determined from the face of the check. Dr. Hall testified that the check was written in June or July. The court presumes July is the correct month as the check appears to have been paid on July 24, 1995. The month of issuance is, however, immaterial.

**15.** See supra note 14.

As of November 13, 1995, the date the Involuntary Petition was filed, Taylor & Associates, L.P. owed Dr. Hall's Money Purchase Pension Plan $1,307,659.65, none of which is contingent as to liability or the subject of a bona fide dispute.[16]

### b. Robert E. Hall, Individually

On February 3, 1995, Dr. Hall gave Mr. Taylor a personal check payable to "Joe Taylor & Assoc." in the amount of $200,000.00 for the purchase of First National Bank of Gatlinburg stock. This check was endorsed by Mr. Taylor on behalf of "Joe Taylor & Assoc." payable to the order of "Joseph Walker" and was negotiated, presumably by Mr. Walker, on February 8, 1995. Dr. Hall does not know a Joseph Walker.

Upon Dr. Hall's inquiry, Mr. Taylor subsequently advised Dr. Hall that the $200,000.00 together with other funds from Dr. Hall's pension plans had been used to acquire 14,000 shares of stock and that he would get his money out of this investment in less than six months. Dr. Hall testified that he never received the stock and that as of November 13, 1995, Taylor & Associates, L.P. owed him $200,000.00.

The court finds that Dr. Hall, individually, has a claim against Taylor & Associates, L.P. that is not contingent as to liability or the subject of a bona fide dispute in the amount of $200,000.00.

### c. Robert E. Hall, M.D., P.A.

On October 16, 1995, Dr. Hall issued a check payable to Joe Taylor in the amount of $150,000.00 for the alleged purchase of First American National Bank stock options. Mr. Taylor represented that the options were to mature prior to the end of December 1995. This check was drawn on Dr. Hall's corporate account at First American National Bank, was delivered to and endorsed by Joseph Taylor in blank, and was negotiated on the date issued, October 16, 1995. The proceeds were utilized by Mr. Taylor to purchase a cashier's check at First American National Bank payable to Joe Taylor and were subsequently deposited to the Taylor & Associates, L.P. account in NationsBank.[17]

Dr. Hall, again through his professional corporation, issued a second check to Taylor & Associates, L.P. on October 16, 1995, in the amount of $350,000.00, and a third check on October 25, 1995, in the amount of $200,000.00 payable to "Joe Taylor & Assoc." Both checks were delivered to Mr. Taylor for the purchase of short-term municipal bonds maturing within thirty days. The proceeds from the $350,000.00 check were deposited to the Taylor & Associates, L.P. account in NationsBank. It is unclear from the endorsement on the October 25, 1995 check where the proceeds went, although the October 25, 1995 check states that it is for "Cashier's Check # 313727788." The cashier's check was not introduced into evidence.

Mr. Taylor, through checks drawn on the Taylor & Associates, L.P. NationsBank account, delivered two checks to Dr. Hall's professional corporation on October 18, 1995,

---

**16.** With regard to all of Dr. Hall's claims, he testified that they are based simply on the difference between what he paid out to Taylor & Associates, L.P. and what was received, and that he never received any stock, stock options, or bonds in return for his investments. The evidence presented clearly establishes that the Money Purchase Pension Plan paid at least $3,286,000.00 to and received at least $1,972,822.69 from Taylor & Associates, L.P. This supports a claim in the amount of $1,313,177.31, not $1,307,659.65.

The parties failed to elicit any testimony from Dr. Hall during the March 1, 1996 hearing that will assist the court in reconciling this discrepancy. For purposes of determining the § 303 issues presently before the court, Dr. Hall's testimony that the Money Purchase Pension Plan was owed $1,307,659.65 by Taylor & Associates, L.P. as of November 13, 1995, has been accepted as true. Nevertheless, if Dr. Hall undervalued the

Money Purchase Pension Plan's claim by $5,517.66, the claim against Taylor & Associates, L.P. remains not contingent as to liability or the subject of a substantial bona fide dispute.

**17.** The court presumes the chain of events regarding this transaction. The record establishes the fact of the $150,000.00 payment to Mr. Taylor on October 16, 1995, the endorsement of the check at First American National Bank on the same date by Taylor, the purchase of a $150,000.00 cashier's check on October 16, 1995, payable to Joe Taylor with Dr. Robert E. Hall, P.A. shown as the remitter, Mr. Taylor's endorsement on the cashier's check accompanied by the account number for the Taylor & Associates, L.P. account in NationsBank, and the deposit ticket showing a $150,000.00 deposit to the Taylor & Associates, L.P. account.

in the respective amounts of $214,830.00 and $44,583.00. Dr. Hall testified these checks represented returns on short-term bonds.

On November 13, 1995, Taylor & Associates, L.P. owed Robert E. Hall, M.D., P.A. $440,587.00. The court finds that Dr. Hall's professional corporation has a claim against Taylor & Associates, L.P. that is not contingent as to liability or the subject of a bona fide dispute in the amount of $440,587.00.

#### d. Defined Benefit Plan

Dr. Hall, through his Defined Benefit Plan, issued a check to Taylor & Associates, L.P. on November 15, 1994, in the amount of $470,000.00, which was negotiated by Mr. Taylor on behalf of Taylor & Associates, L.P. A second check was drawn on the Defined Benefit Plan account on August 9, 1995, in the amount of $500,000.00 payable to "Taylor & Assoc." There is testimony that there were not sufficient funds available to pay the August 9, 1995 check but that it was ultimately paid through additional funds deposited by Dr. Hall and/or Mr. Taylor. The proceeds of this check were deposited to a Taylor & Associates, L.P. account. On June 22, 1995, Joseph Taylor through the Taylor & Associates, L.P. account at NationsBank issued a check payable to Dr. Hall in the amount of $498,880.00. Dr. Hall testified these funds represented a return on his bond investments.

Dr. Hall testified that on November 13, 1995, Taylor & Associates, L.P., owed his Defined Benefit Plan $441,120.00. He further testified that he has never received any stock or stock options promised him from his various investments.

On June 1, 1995, Mr. Taylor wrote Dr. Hall advising him "that the value of the bonds held through Taylor & Associates, LP, in your Defined Benefit Plan as of 12/31/94 was

$476,005.76. In the Money Purchase Pension Plan, the value of bonds held thru Taylor & Associates, LP, as of 12/31/94 was $1,263,-049.30." On or after September 21, 1995, Mr. Taylor, at Dr. Hall's request, gave Dr. Hall a document entitled "Robert Hall Retirement Plans Taylor & Associates, L.P. Investment Balance Sheet" purporting to list the stocks owned by Dr. Hall through his various entities. Dr. Hall testified that Mr. Taylor gave him this "when I told him I wanted my money back." This document reflects investments by Dr. Hall with a cost of $5,715,000.00 and with a market value of $6,845,000.00. This document appears to have been concocted by Mr. Taylor for no purpose other than to satisfy Dr. Hall's inquiries.

The court finds that Dr. Hall, through his Defined Benefit Plan, had a claim against Taylor & Associates, L.P. on November 13, 1995, in the amount of $441,120.00 and that the claim is not contingent as to liability or the subject of a bona fide dispute.[18]

#### 3. Jim Rogers, Sr.

Jim Rogers, Sr. testified that he is the president of Ben Rogers Insurance Agency, Inc. in LaFollette, Tennessee, which he operates with his father, Ben Rogers, and his brother, Mike Rogers. Mr. Rogers testified that he met Joseph C. Taylor in the late 1970s and that he, his father, brother, and insurance agency made a series of investments through Mr. Taylor, the most recent of which were handled through Taylor & Associates, L.P. Mr. Rogers testified that Mr. Taylor would contact him, Ben, or Mike, and that he (Jim Rogers) would secure a cashier's check that he would give to Mr. Taylor or a runner in exchange for postdated checks from Taylor & Associates, L.P. in the amount of the investment plus a return.[19]

---

18. *See supra* note 16. The evidence presented clearly establishes that the Defined Benefit Plan paid at least $970,000.00 to and received at least $498,880.00 from Taylor & Associates, L.P. This supports a claim in the amount of $471,120.00, not $441,120.00. Nevertheless, if Dr. Hall undervalued the Defined Benefit Plan's claim by $30,000.00, the claim against Taylor & Associates, L.P. remains not contingent as to liability or the subject of a substantial bona fide dispute.

19. Mr. Rogers testified that the pattern of exchanging cashier's checks for postdated checks began in June 1994, and that the postdated checks were always drawn on the Taylor & Associates, L.P. account. The pattern was followed in nine out of ten transactions testified to by Mr. Rogers occurring between June 1994 and October 23, 1995. Apparently, Mr. Taylor and Taylor & Associates, L.P. satisfied their obligations on all but the two transactions discussed in this Memorandum. The court notes, however, that

On September 21, 1995, Mr. Rogers obtained a cashier's check in the amount of $62,000.00 payable to Joe Taylor of which $20,000.00 represented funds obtained by Jim Rogers, Sr.[20] Mr. Taylor told him this money would be used to acquire short-term bonds that would be rolled over within thirty to sixty days. On the same date, September 21, 1995, Mr. Taylor gave Jim Rogers, Sr. four checks drawn on the Taylor & Associates, L.P. NationsBank account postdated to November 8, 1995, payable to Mike Rogers, Ben Rogers, Jim Rogers, and Ben Rogers Insurance Agency, Inc. in the respective amounts of $16,759.78, $11,173.18, $22,346.37, and $18,994.41. These checks were never negotiated due to Mr. Taylor's death on November 3, 1995.[21] It is undisputed that the $62,000.00 cashier's check made payable to Joe Taylor from the Rogerses was deposited in the Taylor & Associates, L.P. account.

On October 23, 1995, Mr. Rogers purchased another cashier's check in the amount of $42,000.00 payable to Joe Taylor, of which $15,000.00 represented funds provided by Jim Rogers, Sr. This check was endorsed in blank by Mr. Taylor but the proceeds were not deposited to the Taylor & Associates, L.P. account. The disposition of the proceeds is unknown. Furthermore, the check was picked up by a runner who did not follow the customary pattern of leaving four postdated checks.

Mr. Rogers testified that he received nothing from the proceeds of either the September 21, 1995 check or October 23, 1995 check and that on November 13, 1995, the date the Involuntary Petition was filed, Taylor & Associates, L.P. owed him $35,000.00 principal plus interest, representing his individual portion of the proceeds from the September 21 and October 23, 1995 checks.

Finally, Mr. Rogers testified that he believed himself to be a limited partner of Taylor & Associates, L.P. because he received K–1 reports from the limited partnership and was issued individual partnership checks at the time he delivered cashier's checks to Mr. Taylor. He also testified that he assumed each of his investments, regardless of whether the check was made payable to "Taylor & Associates" or "Joe Taylor," was being made with Taylor & Associates, L.P.

The court finds that on November 13, 1995, Jim Rogers, Sr. held a claim against Taylor & Associates, L.P. not contingent as to liability or the subject of a bona fide dispute in the amount of $35,000.00.

### 4. William W. Gilley

William W. Gilley testified that he is a retired attorney who formally practiced in Sullivan County, Tennessee; that he initially asserted a claim against Taylor & Associates, L.P. in the amount of $1,028,708.00, but that the claim should be amended to account for a $33,298.00 check given him by Mr. Taylor on the Taylor & Associates, L.P. account on May 23, 1995; and that his claim against Taylor & Associates, L.P. on November 13, 1995, amounted to $995,410.00.

Mr. Gilley further testified that he had known Joseph Taylor since 1977 or 1978 when he and an associate, Wayne Culbertson, had dealings with Taylor regarding a change in their pension plan; that he began investing with Taylor in 1990 and became familiar with Taylor & Associates, L.P. in November or December 1993 when Taylor told him he was thinking about forming a

---

notwithstanding that the postdated checks may have been paid by Taylor & Associates, L.P., the proceeds of two of the cashier's checks made payable to Taylor & Associates, L.P., dated June 9, 1994, and January 13, 1995, in the respective amounts of $49,000.00 and $53,000.00, were diverted to third parties. The June 9, 1994 check was endorsed by Mr. Taylor on behalf of "Taylor & Associates, Inc." payable to the order of "R. Wayne Culbertson," and the January 13, 1995 check was endorsed by Mr. Taylor on behalf of "Taylor & Associates" and made payable to "Georgie Walker."

**20.** Ben Rogers, Mike Rogers, and Ben Rogers Insurance Agency, Inc. provided $10,000.00, $15,000.00, and $17,000.00, respectively, in addition to the $20,000.00 provided by Jim Rogers, Sr.

**21.** The checks, totaling $69,273.74, had they been paid, would have provided the payees with a twelve percent return on their $62,000.00 investment in less than seven weeks. This represents an annual return approximating eighty-nine percent.

limited partnership; that he heard nothing more about the partnership until April 1994 when he received a Form K–1 from Taylor & Associates, L.P.; and that when he inquired about Taylor & Associates, L.P. Mr. Taylor told him that a limited partnership had been formed.

Mr. Gilley also testified that on October 30, 1995, he made an investment with Taylor & Associates, L.P. in the amount of $100,000.00. This investment was made on the strength of representations made by Mr. Taylor about a "real good deal going down on Friday [November 3, 1995,]" regarding First American National Bank stock or options. Mr. Gilley testified that he had $100,000.00 and that Taylor told him he would receive a return in mid-November 1995. When Mr. Gilley wanted to give Taylor a check drawn on his personal account, Taylor told him he wanted a cashier's check "because the deal was going down so fast." Mr. Gilley gave the cashier's check to Mr. Taylor's administrative assistant, Sherry Seay. The check, dated October 30, 1995, is payable to "Taylor & Assoc." in the amount of $100,000.00. It is endorsed by Joseph C. Taylor on behalf of "Taylor & Assoc." and made payable to the order of "Jerry Hill." The check was paid on November 1, 1995. Mr. Gilley testified that he does not know a Jerry Hill; that he tried unsuccessfully to stop payment on the cashier's check when he learned of Mr. Taylor's death on November 3, 1995; that Mr. Hill will not return his $100,000.00; and that he did not receive any stock or the return of his funds prior to November 13, 1995.

Mr. Gilley utilized a document provided him by Mr. Taylor entitled "Investment Balance Sheet as of June[ ] 1995" to calculate his claim. This document reflects that Taylor acquired investments for Mr. Gilley which, in June 1995, had a cost of $955,307.00 and a market value of $1,427,945.00. The $995,-410.00 Mr. Gilley claims is owed him by Taylor & Associates, L.P. includes the $100,-000.00 represented by the October 30, 1995 cashier's check.

Mr. Gilley testified that he believes himself to be a limited partner in Taylor & Associates, L.P. because he received K–1 forms from Taylor & Associates, L.P. for 1993 and 1994.

The court finds that the Investment Balance Sheet as of June 1995, which was given Mr. Gilley by Mr. Taylor, together with the proceeds from the $100,000.00 cashier's check given Mr. Taylor by Mr. Gilley on October 30, 1995, clearly establishes Mr. Gilley's claim against Taylor & Associates, L.P., and that the claim is not contingent as to liability or the subject of a bona fide dispute. The fact that a discrepancy may exist in the amount of the claim asserted by Mr. Gilley and in records provided him by Mr. Taylor is of no present consequence.[22]

### 5. Richard E. Gamble, Sr. and Christine M. Gamble

Richard E. Gamble, Sr. is a bookkeeper for Southeast Medical Management, Inc. He and his wife each assert individual claims in the amount of $15,000.00 representing funds allegedly given to Taylor & Associates, L.P. on November 2, 1995.

Mr. Gamble testified that he found out about an investment opportunity with Taylor & Associates, L.P. in the fall of 1995 and, after talking with his wife, decided to invest. He testified that he and his wife borrowed $30,000.00, $20,000.00 from his wife's father and $10,000.00 from a credit card. He also testified that his November 2, 1995 investment was to produce a return by the following Monday. Mrs. Gamble purchased a $30,-000.00 cashier's check from First American National Bank dated November 2, 1995, made payable to "Joe Taylor & Assoc." and delivered the check on the same date, November 2, 1995. On Saturday, November 4, 1995, they learned that Taylor had committed suicide on Friday, November 3, 1995.

---

**22.** The court gives no credence to the Investment Balance Sheet as of June 1995 provided Mr. Gilley by Mr. Taylor other than as an attempt by Mr. Taylor to reconcile amounts paid by Mr. Gilley with the acquisition of investments that appear never to have been acquired. *See supra* note 16. To the extent Mr. Gilley has overstated his claim and can only support a claim against Taylor & Associates, L.P. in the amount of $100,-000.00 based on the cashier's check introduced into evidence at the March 1, 1996 hearing, the court finds that a material portion of Mr. Gilley's claim remains not contingent as to liability or the subject of a bona fide dispute.

Mr. Gamble called the bank to stop payment but was unsuccessful.

Both Mr. and Mrs. Gamble testified that as of November 13, 1995, Taylor & Associates, L.P. owed them $30,000.00. It is undisputed that Mr. and Mrs. Gamble had no discussions with Mr. Taylor prior to the delivery of their check to his office, but that their November 2, 1995 cashier's check was endorsed by Mr. Taylor on behalf of "Joe Taylor & Assoc." and made payable to the order of "Lisa Boyle," who apparently cashed the check. Mr. and Mrs. Gamble are not acquainted with a Lisa Boyle.

The court finds that Richard and Christine Gamble had a claim against Taylor & Associates, L.P. on November 13, 1995, not contingent as to liability or the subject of a bona fide dispute in the amount of $30,000.00.

The only witness to testify other than petitioning creditors was the Interim Chapter 7 Trustee, William T. Hendon. Mr. Hendon testified that the only assets of Taylor & Associates, L.P. he has been able to locate subsequent to his appointment on November 15, 1995, are $36,814.52 from the limited partnership's NationsBank account and $25,000.00 that he has not yet received but expects to receive from his compromise of a claim. He testified that he is unaware of and has not been able to locate other specific assets.

## IV

### GENERALLY NOT PAYING DEBTS REQUIREMENT UNDER 11 U.S.C.A. § 303(h)(1) (WEST 1993)

Dudley W. Taylor contends that the petitioning creditors have not established that at the time of filing the Involuntary Petition, Taylor & Associates, L.P. was generally not paying its debts as they became due. Bankruptcy Code § 303(h)(1) provides that if an involuntary petition is controverted,

> after trial, the court shall order relief against the debtor . . . only if—

> (1) the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute. . . .

11 U.S.C.A. § 303(h)(1) (West 1993).

In determining pursuant to § 303(h)(1) whether a debtor was generally not paying its debts as they became due, the Sixth Circuit advises:

> Normally, the question of whether the debtor is generally not paying its debts as they become due is a question of fact. . . . In making this factual determination, courts look to "the totality of the circumstances existing when the petition is filed." The bankruptcy court considers the proportion of the debt being paid—both in terms of the proportion of creditors being paid and the proportion of debt, in dollar value, being paid.

*Concrete Pumping Serv., Inc. v. King Construction Co. (In re Concrete Pumping Serv., Inc.),* 943 F.2d 627, 630 (6th Cir.1991) (citations omitted) (quoting *Hayes v. Rewald (In re Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.),* 779 F.2d 471, 475 (9th Cir. 1985)). In addition to measuring the portion of debts being paid under a § 303(h)(1) totality of the circumstances test, numerous courts also consider "the debtor's overall conduct in its financial affairs." *In re Norris,* 183 B.R. 437, 456 (Bankr.W.D.La.1995); *see Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.,* 779 F.2d at 475; *In re Ethanol Pac., Inc.,* 166 B.R. 928, 931 (Bankr.D.Idaho 1994).

■ The evidence presented at the March 1, 1996 hearing establishes that at the time the Involuntary Petition was filed, Taylor & Associates, L.P. was generally not paying its debts as they became due. Taylor & Associates, L.P. was unable to satisfy its debts because of the fraudulent nature of its business, which Dudley W. Taylor recognized in a brief filed January 16, 1996.[23] More-

---

**23.** Dudley W. Taylor included in his brief:
This Court is being asked to create a partnership out of a series of illegal and fraudulent acts perpetrated by J[oseph C]. Taylor, and is being asked to find a partnership between the perpetrator of numerous frauds and the victims of these frauds. A Ponzi scheme cannot be, nor can it create, a partnership. J[oseph C]. Taylor was a crook. . . .

over, the petitioning creditors who testified at the hearing hold noncontingent, undisputed claims against Taylor & Associates, L.P. The majority of these claims were due and owing at the time the Involuntary Petition was filed and Taylor & Associates, L.P. was and remains unable to satisfy these debts. The Interim Chapter 7 Trustee, Mr. Hendon, has only been able to locate assets totaling less than $75,000.00, which includes the $36,-814.52 balance from the limited partnership's NationsBank account. Apparently, there are no investment accounts, no stocks or stock options, and no bonds. However, the petitioning creditors alone hold claims against Taylor & Associates, L.P. that total well over $3,000,000.00. Clearly, prior to the filing of the Involuntary Petition, the fraudulent business scheme of Taylor & Associates, L.P. began to collapse and the limited partnership was unable to generally pay its debts as they became due.

## V

### CONCLUSION

For the reasons hereinabove stated, the court finds that James S. Bush, Johnson and Galyon, Inc., Robert E. Hall, individually, Robert E. Hall, M.D., Trustee for Robert E. Hall, M.D., P.A. Money Purchase Pension Plan, Robert E. Hall, M.D., Trustee for Robert E. Hall, M.D., P.A. Defined Benefit Plan, Robert E. Hall, M.D., P.A., Jim Rogers, Sr., William W. Gilley, Richard E. Gamble, Sr., and Christine M. Gamble each hold claims against Taylor & Associates, L.P., a Tennessee limited partnership, that are not contingent as to liability or the subject of a bona fide dispute; that such claims aggregate at

least $10,000.00 more than the value of any lien on property of Taylor & Associates, L.P. securing such claims; and that Taylor & Associates, L.P. is generally not paying its debts as such debts become due.

Based upon the above, an order for relief will be entered against Taylor & Associates, L.P. under Chapter 7 of Title 11 of the United States Code.

The record before the court clearly establishes that Taylor & Associates, L.P.'s general partner, Joseph C. Taylor, died November 3, 1995, and that the business operations of Taylor & Associates, L.P. ceased at that time. As the Interim Trustee's testimony implies that he has been unable to identify any employees or other general partners of Taylor & Associates, L.P., the court, pursuant to Fed.R.Bankr.P. 1007(k),[24] will direct that the person appointed by the United States Trustee to serve as interim trustee pursuant to 11 U.S.C.A. § 701(a) (West 1993) shall, to the extent permitted by books, records, and related information discovered by the present Interim Trustee, William T. Hendon, file the list of creditors required by Fed.R.Bankr.P. 1007(a)(2) within fifteen days after entry of the order for relief, and file the statements and schedules required by Fed. R.Bankr.P. 1007(b)(1) as expeditiously as possible but no later than thirty days after entry of the order for relief. The court will further direct that the cost incurred in preparing the list, statements, and schedules shall be reimbursed as an administrative expense pursuant to 11 U.S.C.A. § 503(b)(1)(A) (West Supp.1995).

An appropriate order will be entered.

---

The business transactions of Taylor & Associates, L.P. presumably ended with the death of its general partner, Joseph C. Taylor, on November 3, 1995, when the alleged fraudulent business scheme began to collapse and the investors' claims could not be satisfied. *See Merrill v. Abbott* (*In re Independent Clearing House Co.*), 77 B.R. 843, 860 (D.Utah 1987) ("A Ponzi scheme cannot work forever. The investor pool is a limited resource and will eventually run dry. The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors. The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors. He must know all along, from the very nature of

his activities, that investors at the end of the line will lose their money.").

24. Federal R.Bankr.P. 1007(k) provides:

(k) **Preparation of list, schedules, or statements on default of debtor.**—If a list, schedule, or statement, other than a statement of intention, is not prepared and filed as required by this rule, the court may order the trustee, a petitioning creditor, committee, or other party to prepare and file any of these papers within a time fixed by the court. The court may approve reimbursement of the cost incurred in complying with such an order as an administrative expense.

### ORDER FOR RELIEF

In accordance with the Memorandum on Contested Involuntary Petition filed this date, the court directs the following:

1. An Order for Relief is entered under Chapter 7 of Title 11 of the United States Code against Taylor & Associates, L.P., a Tennessee limited partnership.

2. The interim Chapter 7 trustee appointed by the United States Trustee pursuant to 11 U.S.C.A. § 701(a) (West 1993) shall, to the extent permitted by existing books, records, and related information discovered by the present Interim Trustee, William T. Hendon, file the list of creditors required by Fed. R.Bankr.P. 1007(a)(2) within fifteen (15) days after entry of this Order for Relief, and file the statements and schedules required by Fed.R.Bankr.P. 1007(b)(1) as expeditiously as possible but no later than thirty (30) days after entry of this Order for Relief. The cost incurred in preparing the list, statements, and schedules shall be reimbursed as an administrative expense pursuant to 11 U.S.C.A. § 503(b)(1)(A) (West Supp.1995).

SO ORDERED.