**In re TAYLOR & ASSOCIATES, . L.P., Debtor.**

**No. 95–33024.**

United States Bankruptcy Court, E.D. Tennessee.

April 3, 1998.

Stephen A. McSween, Herbert H. Slatery, III, Reese K. Thomas, Egerton, McAfee, Armistead & Davis, P.C., Knoxville, TN, for James S. Bush and Johnson & Galyon, Inc., Petitioners.

C. Mark Troutman, McCord & Troutman, P.C., Knoxville, TN, for Petitioners, Robert E. Hall, individually, Robert E. Hall, M.D., Trustee for Robert E. Hall, M.D., P.A. Money Purchase Pension Plan, Robert E. Hall, M.D., Trustee for Robert E. Hall, M.D., P.A. Defined Benefit Plan, Robert E. Hall, M.D., P.A., Jim Rogers, Sr., Mike Rogers, and Ben F. Rogers.

Beverly P. Sharpe, McKinney & Sharpe, Knoxville, TN, for Petitioners, Richard E. Gamble, Sr. and Christine M. Gamble.

David H. Jones, the Taylor Law Firm, Knoxville, TN, for Dudley W. Taylor.

Robert M. Bailey, N. David Roberts, Jr., Bailey, Roberts & Bailey, P.L.L.C., Knoxville, TN, for William T. Hendon, Interim Trustee.

United States Trustee, Region 8, Patricia C. Foster, Ellen B. Vergos, Knoxville, TN, for United States Trustee.

## MEMORANDUM

RICHARD S. STAIR, Jr., Chief Judge.

This involuntary case was commenced under Chapter 7 with the filing of an Involuntary Petition against Taylor & Associates, L.P. on November 13, 1995, by James S. Bush.[1] The Involuntary Petition was subsequently joined by twelve additional creditors. On December 1, 1995, Dudley W. Taylor filed a Motion to Dismiss Involuntary Petition[2] alleging, *inter alia*, that Taylor & Associates, L.P. is not an entity that qualifies as a debtor under 11 U.S.C.A. § 109(b) (West 1993 & Supp. 1995).[3]

The sole eligibility issue raised by Dudley W. Taylor in his dismissal motion was Taylor & Associates, L.P.'s status as a general or limited partnership under Tennessee law.[4] In a Memorandum filed January 26, 1996, the court, in denying Dudley W. Taylor's Motion to Dismiss Involuntary Petition made a number of findings, including the finding that Taylor & Associates, L.P. was a limited partnership under Tennessee law and was therefore eligible to be a debtor under Chapter 7 pursuant to § 109(b). *See In re Taylor & Assocs., L.P.*, 191 B.R. 374 (Bankr.E.D.Tenn.1996), *rem'd, Taylor v. Bush (In re Taylor & Assocs., L.P.)*, 249 B.R. 431 (E.D.Tenn. 1997). The court thereafter tried the contested Involuntary Petition on March 1, 1996, on the limited issues of whether the petitioners were entitled to maintain the Involuntary Petition pursuant to 11 U.S.C.A. § 303(b) (West 1993 & Supp. 1995) and whether, pursuant to 11 U.S.C.A. § 303(h)(1) (West 1993), Taylor & Associates, L.P. was "generally not paying such debtor's debts as such debts bec[a]me due unless such debts are the subject of a bona fide dispute[.]"

Subsequent to the conclusion of the March 1, 1996 trial, the court sustained the Involuntary Petition and entered an Order for Relief under Chapter 7 on March 8, 1996, supported by a Memorandum on Contested Involuntary Petition. *See In re Taylor & Assocs., L.P.*, 193 B.R. 465 (Bankr.E.D.Tenn.1996). Dudley W. Taylor thereafter perfected an appeal to the district court. That court, on March 28, 1997, pursuant to an Order and supporting Memorandum, vacated the Order for Relief and remanded the matter to this court for an evidentiary hearing on Taylor &

---

1. The entity against whom the Involuntary Petition was filed, Taylor & Associates, L.P., has not always been referred to as "Taylor & Associates, L.P." throughout the course of the contested involuntary petition. For the sake of consistency, the court will refer to the alleged debtor throughout this Memorandum as Taylor & Associates, L.P. unless a particular documented reference to the alleged debtor is discussed, in which case the name of the alleged debtor will be quoted exactly as the name appears in the document.

2. Dudley W. Taylor's standing to oppose the Involuntary Petition arises under FED. R. BANKR. P. 1011 because James S. Bush, the original petitioner, alleged in a response to the motion to dismiss that Dudley W. Taylor was a general partner of Taylor & Associates, L.P. *See In re Taylor & Assocs., L.P.*, 191 B.R. 374, 379–80 (Bankr.E.D.Tenn.1996). Dudley W. Taylor denies the existence of Taylor & Associates, L.P. as a partnership and denies that he was a partner.

3. All statutory citations referred to in this Memorandum are those in effect at the time of the filing of the Involuntary Petition.

4. Pursuant to § 109(b) only a "person" may be a debtor under Chapter 7. A person is defined under the Bankruptcy Code to include "individual, partnership, and corporation." *See* 11 U.S.C.A. § 101(41) (West Supp.1995). *See also* 11 U.S.C.A. § 101(13) (West 1993).

Associates, L.P.'s status under Tennessee law as a general or limited partnership. Specifically, the district court directs in its Order that the matter is remanded "for proceedings consistent with the matters stated in [its] Memorandum."

Subsequent to receipt of the district court's March 28, 1997 remand Order and Memorandum, and after other procedural appellate hurdles had been resolved, the court held a scheduling conference on September 4, 1997. Emanating from the scheduling conference was a Pretrial Order entered on September 17, 1997, which was subsequently supplanted by an Amended Pretrial Order entered on October 15, 1997.[5] The Amended Pretrial Order identified the issue the court is called upon to resolve as follows:

> 3. The sole issue for trial is whether Taylor & Associates, L.P., was, pursuant to 11 U.S.C.A. § 109(b) (West 1993), a "person" eligible to be a debtor under Chapter 7 at the time the Involuntary Petition was filed against it. Specifically, the issue is whether a factual basis exists to allow this court to determine that Taylor & Associates, L.P., was eligible to be a debtor under Chapter 7 as either a limited or general partnership under Tennessee law, or whether Taylor & Associates, L.P., was a "corporation" as defined at 11 U.S.C.A. § 101(9) (West 1993), i.e., an unincorporated company or association or business trust under Tennessee law.

Furthermore, the Amended Pretrial Order established certain scheduling guidelines regarding the prosecution and defense of the "corporation" issue by the petitioners and Dudley W. Taylor. Specif-

ically, the Amended Pretrial Order directs in material part:

> 4. . . . To the extent the petitioning creditors rely on the existing record to support their theory that Taylor & Associates, L.P., was a "corporation," they shall file and serve on Dudley W. Taylor a written designation of relevant portions of the transcript, including documents, in support of their argument by October 31, 1997. Dudley W. Taylor shall file and serve on the petitioning creditors his designation of relevant portions of the existing record to support his argument on the "corporation" issue by November 14, 1997. The court will not consider any portion of the existing record in its resolution of the "corporation" issue not specifically designated by the parties.

> 5. The petitioning creditors shall, within ten (10) days, serve Dudley W. Taylor with a designation of the witnesses they anticipate calling at the trial in support of their theory that Taylor & Associates, L.P., was a "corporation" and with written notice regarding all discovery they desire to take relating to the "corporation" issue.

The petitioners failed to comply with the scheduling requirements of paragraphs 4 and 5 of the Amended Pretrial Order and the court, upon consideration of a Motion to Dismiss Involuntary Petition or, in the Alternative, to Exclude Evidence at Trial and for Sanctions filed by Dudley W. Taylor on November 10, 1997, directed, *inter alia*, that the petitioners were precluded from introducing evidence at the trial on the "corporation" issue that was already included within the existing record and from calling witnesses at the trial in sup-

5. The Amended Pretrial Order was necessitated by a Motion to Amend Pretrial Order filed by certain of the petitioners on September 26, 1997. By this motion, the petitioners sought to expand the scope of the eligibility issue originally presented to the court upon the filing of the Involuntary Petition beyond that of Taylor & Associates, L.P.'s eligibility to be a debtor as a general or limited partnership, to also include Taylor & Associates, L.P.'s eligibility to be a debtor as a "corporation," as defined at 11 U.S.C.A. § 101(9)(A)(iv)-(v) (West 1993). The court granted the Motion to Amend Pretrial Order over Dudley W. Taylor's objection. *See In re Taylor & Assocs., L.P.,* Case No. 95-33024, slip op. (Bankr. E.D.Tenn. Oct. 15, 1997).

port of their "corporation" theory. *See Taylor & Associates, L.P.*, Case No. 95–33024, slip op. at 10 (Bankr.E.D.Tenn. Nov. 14, 1997).

On December 1 and 2, 1997, the court conducted an evidentiary hearing on Taylor & Associates, L.P.'s eligibility to be a debtor under Chapter 7 as a general or limited partnership. The record before the court consists of the testimony of witnesses[6] and 107 exhibits, forty-eight of which were admitted into evidence at the March 1, 1996 hearing on the contested Involuntary Petition.

## I

### The District Court's March 28, 1997 Remand Order

As a threshold matter, the court will address the district court's March 28, 1997 Order and Memorandum as they affect the petitioners' burden of proof on Taylor & Associates, L.P.'s eligibility to be a debtor under Chapter 7.

■ " 'Under the "law of the case" doctrine, a court is ordinarily precluded from reexamining an issue previously decided by the same court, or a higher court, in the same case.' " *Consolidation Coal Co. v. McMahon*, 77 F.3d 898, 905 n. 5 (6th Cir.1996) (quoting *Richardson v. United States*, 841 F.2d 993, 996 (9th Cir.1988)). This doctrine gives rise to the mandate rule, which stands for the proposition that a lower court must abide by the mandate of a superior court. *United States v. Moored*, 38 F.3d 1419, 1421 (6th Cir.1994); *see also Hanover Ins. Co. v. American Eng'g Co.*, 105 F.3d 306, 312 (6th Cir.1997) ("It is clear that when a case has been remanded by an appellate court, the trial court is bound to 'proceed in accordance with the mandate and law of the case as established by the appellate court.' ") (quoting *Petition of U.S. Steel Corp.*, 479

F.2d 489, 493 (6th Cir.1973), *cert. denied*, 414 U.S. 859, 94 S.Ct. 71, 38 L.Ed.2d 110 (1973)).

■ As noted earlier, the March 28, 1997 Order of the district court "REMAND[ED] th[e] matter for proceedings consistent with the matters stated in [its] Memorandum." "When the reviewing court, in its mandate, prescribes that a court shall proceed in accordance with the opinion of the reviewing court or that a court shall proceed for the reasons given in the opinion, that pronouncement operates to incorporate the opinion into the mandate." *Jones v. Lewis*, 957 F.2d 260, 262 (6th Cir.1992), *cert. denied*, 506 U.S. 841, 113 S.Ct. 125, 121 L.Ed.2d 80 (1992). Given that the district court's mandate incorporates its March 28, 1997 Memorandum, this court must determine the status of Taylor & Associates, L.P. as a general or limited partnership within the guidelines enunciated by the district court. That court has clearly instructed this court and the petitioners regarding the proof that will be required to establish Taylor & Associates, L.P. as a limited or general partnership.

Regarding the proof required to substantiate Taylor & Associates, L.P. as a limited partnership, the district court, concluding that the record produced in conjunction with Dudley W. Taylor's December 1, 1995 dismissal motion was insufficient to support this court's determination that Taylor & Associates, L.P. was a limited partnership, succinctly directed that circumstantial evidence, regardless of how compelling, is insufficient to establish Taylor & Associates, L.P. as a limited partnership. *See Taylor & Assocs., L.P.*, 249 B.R. at 443–46. Specifically, the district court instructed:

> Given that a limited partnership is a "creature of statute," the presence of

---

**6.** None of the petitioners testified at the December 1 and 2, 1997 hearing. Testimony of those petitioners who testified at the March 1, 1996 hearing on the contested Involuntary

Petition is, of course, part of the record. That testimony is, for the most part, not relevant to the eligibility issue presently before the court.

statutory prerequisites is mandatory. This Court finds the evidence supporting the existence of TALP [Taylor & Associates, L.P.] as a limited partnership lacks some of those elementary prerequisites: a valid Certificate, an agreement or understanding between the alleged partners, and at least one limited partner.

*Id.*, 249 B.R. at 445–46.

The district court also provided instructions regarding the petitioners' burden of proof if they are to establish that Taylor & Associates, L.P. operated as a general partnership.

> While it is clear establishing the existence of a [general] partnership is a less rigid process than for a limited partnership, there must still be sufficient evidence of "the intent to do the things which constitute a partnership ... [which] may be implied from the circumstances *where it appears that the individuals involved have entered into a business relationship for profit,* combining their property, labor, skill, experience, or money."

*Id.*, 249 B.R. at 447 (quoting *Bass v. Bass,* 814 S.W.2d 38, 41 (Tenn.1991)).

The district court further instructed:

> "[W]hile it is not essential that ... [contracts of partnership] be in writing, nevertheless, when an oral contract is sought to be enforced the [triers] of fact are required to carefully scrutinize and weigh the evidence, and should be satisfied of its existence by clear and convincing proof. To be an enforceable contract it must, among other elements, result from *a meeting of the minds in mutual assent to terms,* must be based upon sufficient consideration, and *must be sufficiently definite.*"

> Whether a general partnership existed would rest upon consideration of precisely who were the partners, when exactly was the partnership formed, how

long did the partnership last, was it dissolved by the withdrawal of partners, and what was the purpose of the partnership.

*Id.*, 249 B.R. at 447 (citation omitted) (quoting *Wheeler v. Haley,* No. 91–267–I, 1993 WL 398489, at *3–4 (Tenn.Ct.App. Oct.1, 1993)).

Finally, the district court instructed that in a general partnership there must be

> evidence of the intent to do the things which constitute a partnership. Such evidence would show each party recognized, accepted, *or understood its own contribution* to the business relationship, as well as acknowledged the contribution of the other party, as part of a *joint effort.*

*Id.*, 249 B.R. at 448.

The district court's conclusions on both the limited and general partnership issues, as discussed above, followed a thorough analysis of Tennessee law on partnerships as that law applied to the record generated by Dudley W. Taylor's Motion to Dismiss Involuntary Petition. That record, which was voluminous, was found by the district court to be insufficient to support this court's determination that Taylor & Associates, L.P. was a limited partnership. Accordingly, it was incumbent upon the petitioners at the December 1–2, 1997 hearing to present proof on the limited and general partnership issues beyond that presented to the court in conjunction with Dudley W. Taylor's December 1, 1995 dismissal motion. For that reason, the court will analyze the record before it with specific reference to the district court's March 28, 1997 Memorandum.

## II

From the record before it, the court makes the following findings of fact:[7]

---

7. This court customarily makes its findings of fact in narrative form. However, in this mat-

ter, numbered paragraphs better facilitate the isolation of relevant portions of the record.

## Joseph Taylor/John Buchheit Attempt to Form Limited Partnership[8]

1. Joseph Taylor (J. Taylor) engaged in the sale of securities through an affiliation with a company by the name of Advanced Financial Planning Securities Corp. (Advanced Financial Planning). (Andrew Dep. at 7;[9] Tr. at 352.[10])

2. J. Taylor operated his business under several names that were used interchangeably, including, but not limited to, Joe Taylor & Associates, Joe Taylor & Associates, L.P., Taylor & Associates, L.P., and Taylor & Associates, Inc.[11] (Tr. at 188; Ex. 65.)

3. J. Taylor approached a pharmacist named John Buchheit (Buchheit) sometime between the fall of 1993 and the spring of 1994 regarding an investment in a medical equipment business known as Valley Medical Systems (Valley Medical).[12] (Tr. at 96, 275–76.)

4. Valley Medical was a client of Harold Elkins (Elkins), a certified public accountant who did some work for J. Taylor. (Tr. 32, 42, 96.)

5. J. Taylor asked Buchheit to assess Valley Medical, to tell J. Taylor what he thought about the business, and let J. Taylor know if he was interested in investing in the business. (Tr. at 276–77.)

6. J. Taylor told Buchheit that if he would look into the potential investment, J. Taylor would prepare the necessary paperwork to make the investment in the event that Buchheit was interested. (Tr. at 278.)

7. Meanwhile, Elkins contacted Dudley W. Taylor (D.Taylor), an attorney, about the Valley Medical investment. (Tr. at 334.)

8. D. Taylor was led to believe that J. Taylor was looking into the possibility of making an investment in Valley Medical together with Buchheit. (Tr. at 335, 339.)

9. D. Taylor was asked to determine the best type of vehicle by which J. Taylor and Buchheit could make the Valley Medical investment. (Tr. at 335.)

10. Concluding the best vehicle for such an investment to be a limited partnership, D. Taylor prepared the paperwork to organize a limited partnership. (Tr. at 96, 335–36.)

11. D. Taylor was under the impression that J. Taylor was to be a general partner and Buchheit was to be a limited partner, with no other individuals being involved in the proposed partnership. (Tr. at 339.)

12. D. Taylor himself was never asked to be a partner in the Valley Medical transaction and never considered the idea of being such a partner. (Tr. at 340.)

13. D. Taylor prepared a draft limited partnership agreement for J. Taylor and Buchheit to sign. (Tr. at 96, 341.)

14. D. Taylor also prepared a "Certificate of Limited Partnership of Taylor and Associates, L.P." (Tr. at 336; Ex. 49.)

8. The district court identified "at least four different contexts in which someone referred to [Taylor and Associates, L.P.]" *Taylor & Assocs., L.P.,* 249 B.R. at 443–44. For the sake of clarity, the findings of fact made by this court are organized within the four contexts identified by the district court, all of which were discussed during the course of the December 1–2, 1997 trial.

9. All references throughout this Memorandum to the Andrew Deposition are to exhibit 75, the Deposition of David Andrew taken on November 14, 1997.

10. All references to a transcript (Tr.) are references to the December 1–2, 1997 transcript unless otherwise designated.

11. The record is unclear as to whether the word "and" within the name of these entities is spelled out in its entirety or abbreviated by the use of an ampersand.

12. The record contains references to Valley Medical as both Valley Medical Systems, Inc. and Valley Medical Systems, L.P. (Exs.55–57, 59.)

15. J. Taylor was the person who suggested the name Taylor & Associates, L.P. (Tr. at 338.)

16. D. Taylor prepared a Form SS–4 Application for Employer Identification Number, dated March 9, 1994, for "Taylor and Associates, L.P." (Ex. 50.)

17. A notice, dated March 16, 1994, was sent to J. Taylor by the Internal Revenue Service notifying J. Taylor of the assignment of an employer identification number for "Taylor & Associates LP." (Ex. 51.)

18. D. Taylor's law firm attempted to file the certificate of limited partnership with the office of the Secretary of State of Tennessee. (Tr. at 337.)

19. The filing of the certificate of limited partnership was rejected on the basis that the name of the proposed limited partnership, "Taylor and Associates, L.P.," was too similar to the name of a corporation controlled by J. Taylor, the name of the corporation being either Taylor & Associates, Inc. or Joseph C. Taylor & Associates, Inc.[13] (Tr. at 337.)

20. In May 1994, D. Taylor's law firm filed the certificate of limited partnership a second time, accompanied by a letter explaining that the certificate should be accepted because the proposed partnership and the similarly named corporation were controlled by the same entity, that being J. Taylor. (Tr. at 337.)

21. D. Taylor never received a response to the letter. (Tr. at 337.)

22. Not until after the death of J. Taylor did D. Taylor discover that the certificate of limited partnership had been accepted and filed with the Tennessee Secretary of State. (Tr. at 338.)

23. Following his investigation of Valley Medical, Buchheit informed J. Taylor that he had no interest in making an investment in the business. (Tr. at 278.)

24. Buchheit never invested in Valley Medical. (Tr. at 97, 120, 278, 342.)

25. Buchheit never signed any paperwork with respect to an investment in Valley Medical. (Tr. at 278, 341.)

26. J. Taylor, although having signed the "Certificate of Limited Partnership of Taylor and Associates, L.P.," never signed the draft partnership agreement prepared by D. Taylor. (Tr. at 341.)

### Joseph Taylor's Solo Investment in Valley Medical

27. Despite Buchheit's refusal to participate in the Valley Medical investment, J. Taylor invested $125,000.00 with Valley Medical. (Tr. at 342.)

28. The following exhibits regarding J. Taylor's investment in Valley Medical have been introduced:

A. A March 9, 1994 Memorandum from D. Taylor to Sandra Plummer (Plummer), the president of Valley Medical, and J. Taylor regarding "a Security Agreement and UCC–1 to file in connection with securing that part of the investment to be made by Joe, through his Limited Partnership, which will be designated as a loan." (Ex. 54.)

B. A May 24, 1994 letter from Joanne M. Pierce (Pierce), a paralegal then employed by D. Taylor's law firm, to Plummer regarding the need to file an additional UCC–1 to secure the loan/investment of "Taylor and Associates, L.P." (Ex. 55.)

C. A UCC–1 filed on behalf of "Taylor and Associates, L.P.," being identified as the secured party, with respect to "Valley Medical Systems, Inc.," being identified as the debtor. (Ex. 56.)

D. A UCC–1 filed on behalf of "Taylor and Associates, L.P.," being identified as the secured party, with respect to "Valley Medical Systems, L.P.," being identified as the debtor. (Ex. 57.)

E. A July 1, 1994 letter from Pierce to Plummer regarding a copy of a UCC–

---

**13.** The record is unclear as to whether the word "and" within the name of the corporate entity is spelled out in its entirety or abbreviated by the use of an ampersand.

1 filed by "Taylor and Associates, L.P." (Ex. 59.)

## Joseph Taylor's Solicitation of Investors

### A. Harold Elkins, Robert Fannon, Jerry Hill, Ronald Mabry, Vickie Mabry and Don Poteet

29. Elkins began investing with J. Taylor in 1980 and continued to invest with J. Taylor until J. Taylor died. (Tr. at 93.)

30. In October 1994, J. Taylor asked Elkins to do some tax work for Taylor & Associates, L.P. (Tr. at 32.)

31. Specifically, J. Taylor asked Elkins to assist him in the preparation of some K–1 forms that he wanted to provide to investors. (Tr. at 33.)

32. Elkins agreed to perform the requested services. (Tr. at 33.)

33. Among the K–1s prepared by Elkins are those prepared for the tax year of 1993 for Robert Fannon, Jerry Hill, Ronald Mabry, Vickie Mabry and Don Poteet. (Tr. 35–36; Ex. 104.)

34. All five of these K–1s identify the individuals for whom they were prepared as limited partners of "Taylor and Associates, L.P." (Ex. 104.)

35. Elkins also prepared a K–1 for himself for the tax year of 1993. (Tr. at 34; Ex. 93.)

36. Elkins' K–1 identifies him as a limited partner of "Taylor and Associates, L.P." (Ex. 93.)

37. On his 1993 federal income tax return, Elkins reported the income listed on his K–1 as a capital gain from a partnership. (Tr. at 47; Ex. 90.)

38. Elkins prepared both a draft and final copy of a Form 1065 partnership return for "Taylor and Associates, L.P."

for the tax year of 1993. (Tr. 51–53; Exs. 52, 92.)

39. Both the draft and final copy identify "Taylor and Associates, L.P." as the name of the partnership and identify the principal product or service of the partnership as "Investments." (Exs.52, 92.)

40. The final copy identifies "Joseph C. Taylor" as the general partner and identifies the entity filing the return as a limited partnership. (Tr. at 54; Ex. 52.)

41. The $337,848.00 of partnership income reported on the draft copy of the Form 1065 was allocated amongst Robert Fannon, Jerry Hill, Ronald Mabry, Vickie Mabry, Don Poteet, Elkins and J. Taylor. (Tr. at 60–61.)

42. The draft copy of the Form 1065 lists, on Schedule L, partners' capital accounts of $1,728,381.00. (Ex. 92.)

43. Elkins understood this figure to represent the outstanding investments of Robert Fannon, Jerry Hill, Ronald Mabry, Vickie Mabry, Don Poteet, Elkins and J. Taylor.[14] (Tr. at 63–65.)

44. All the information reported on the above mentioned K–1s and the Form 1065 was supplied to Elkins by J. Taylor and Elkins did not perform any independent investigation to verify the information. (Tr. at 104–110.)

45. Elkins prepared an application for an extension of time to file a partnership return, dated April 6, 1994, on behalf of "Taylor & Associates, L.P." (Tr. at 39–40; Ex. 91.)

46. Elkins would sometimes prepare, but not sign, checks drawn on a bank account under the name of "Taylor & Associates LP." (Tr. at 77.)

47. Elkins understood that his investment funds were deposited into, and that

---

14. At trial, Elkins testified that this figure did *not represent outstanding investments.* (Tr. at 62–63.) However, this testimony was impeached by testimony given by Elkins during the course of a FED. R. BANKR P. 2004 examination where Elkins testified that he did understand the figure to represent outstanding investments of the seven individuals. (Tr. at 63.) After being impeached, Elkins admitted that the figure represented funds contributed by the seven individuals.

his investment returns were drawn from, a checking account opened under the name of Taylor & Associates, L.P. (Tr. at 83–84.)

48. Elkins further understood that the funds of other investors were channeled through the Taylor & Associates, L.P. account. (Tr. at 84.)

49. J. Taylor told Elkins that J. Taylor was a general partner. (Tr. at 46.)

50. Elkins never thought that he was investing with a partnership. (Tr. at 100.)

51. J. Taylor never asked Elkins to be a partner. (Tr. at 100–01.)

52. J. Taylor did tell Elkins that Elkins was one of seven partners in Taylor & Associates, L.P. (Tr. at 124–25.)

53. Elkins never agreed to be a partner with J. Taylor. (Tr. at 101.)

54. Elkins thought that he was investing with or through J. Taylor as a broker. (Tr. at 101.)

55. Elkins did not agree to share his investments or returns with anyone else. (Tr. at 101.)

56. Elkins did not expect to share in the returns of others who invested with J. Taylor. (Tr. at 101–02.)

57. It was Elkins' understanding that the Taylor & Associates, L.P. checking account was simply a clearing account for investments that J. Taylor solicited from various investors. (Tr. at 102.)

58. When Elkins received checks drawn on the Taylor & Associates, L.P. account, he did not think that he was receiving checks from a partnership. (Tr. at 102–03.)

### B. Carl Claiborne

59. When Carl Claiborne (Claiborne), a farmer from Speedwell, Tennessee, met with J. Taylor in 1993 to review certain investments that Claiborne had made with J. Taylor, J. Taylor solicited Claiborne's participation in a bond investment. (Tr. at 193–197.)

60. Claiborne decided to make the investment, issuing a check payable to Joe Taylor. (Tr. at 197.)

61. Claiborne received a return on that investment from Taylor & Associates, L.P. (Tr. at 197–98.)

62. When Claiborne inquired of J. Taylor as to the purpose of the L.P. designation, he was informed that it was for the people in the investment circle. (Tr. at 198.)

63. Claiborne asked J. Taylor if Claiborne was a limited partner and J. Taylor told him that he was. (Tr. at 200.)

64. Claiborne testified that it did not matter to him how J. Taylor labeled him and he did not care to know who else was investing with J. Taylor so long as Claiborne received a good return on his investment. (Tr. at 200, 204.)

65. J. Taylor did inform Claiborne that there would be other participants in the investments he made but Claiborne did not inquire as to who those people were. (Tr. at 205.)

### C. James S. Bush

66. J. Taylor told James S. Bush (Bush) of an investment opportunity through a partnership, Taylor & Associates, L.P., and that D. Taylor was a member of that partnership. (March 1, 1996 Tr. at 19.)

67. Bush never saw a partnership agreement or other partnership records. (March 1, 1996 Tr. at 31.)

### D. Jim Rogers Sr.

68. Jim Rogers, Sr. (Rogers), after he met with his accountant in November 1995, came to the conclusion that he was a limited partner based upon his receipt of a K–1 and the fact that all of the checks he received as returns on his investments were drawn on the account of Taylor & Associates, L.P. (March 1, 1996 Tr. at 146–47.)

69. Rogers never saw a partnership agreement or other partnership documents. (March 1, 1996 Tr. at 147.)

### E. William W. Gilley

70. In November or December 1993, J. Taylor told William W. Gilley (Gilley) that J. Taylor was thinking about forming a limited partnership. (March 1, 1996 Tr. at 161.)

71. Gilley did not hear anything further about a limited partnership until April 1994 when he received a K–1 in the name of Taylor & Associates, L.P. (March 1, 1996 Tr. at 161–62.)

72. The following month, Gilley contacted J. Taylor seeking an explanation as to the partnership issue and was told by J. Taylor that J. Taylor had formed a limited partnership. (March 1, 1996 Tr. at 161.)

73. Gilley did not sign any partnership papers or anything else of that nature. (March 1, 1996 Tr. at 161.)

74. Based upon the foregoing events and his receipt of a second K–1 from J. Taylor, Gilley believed that he was one of a small number of limited partners. (March 1, 1996 Tr. at 173–74.)

### F. Richard E. Gamble Sr.

75. Richard E. Gamble, Sr. (Gamble) heard about an investment opportunity with J. Taylor from his employer. (March 1, 1996 Tr. at 181.)

76. Gamble made an investment with J. Taylor by means of a cashier's check made out to Joseph C. Taylor & Associates. (March 1, 1996 Tr. at 183–84.)

77. Gamble never had any conversations with J. Taylor. (March 1, 1996 Tr. at 182.)

### Dudley Taylor/Lori Fleishman Involvement Regarding Investment Projects

78. Lori Fleishman (Fleishman) is an attorney and D. Taylor's law partner. (Tr. at 148–49.)

79. D. Taylor and Fleishman first invested with J. Taylor, through their law firm of Taylor & Fleishman d/b/a The Taylor Law Firm, in July 1994. (Tr. at 149–51.)

80. In relation to the investment activities of D. Taylor and Fleishman, their law firm received checks from and made out checks to Taylor & Associates, L.P. (Tr. at 152.)

81. In addition to their investments through their law firm, D. Taylor and Fleishman also invested with J. Taylor individually. (Tr. at 151–52.)

82. When Fleishman received funds from J. Taylor, she would receive a check drawn on the account of Taylor & Associates, L.P. (Tr. at 176.)

83. Fleishman questioned J. Taylor as to why certain checks were drawn on the account of a limited partnership. (Tr. at 190.)

84. J. Taylor told Fleishman that he had ordered several boxes of checks when he initially opened the account and that he would open an account in his individual capacity as soon as he finished off the limited partnership checks. (Tr. at 190.)

85. J. Taylor told D. Taylor that the Taylor & Associates, L.P. checking account was simply a clearing account for J. Taylor. (Tr. at 494.)

86. Fleishman sent the following letter, dated March 28, 1995, to J. Taylor:

I am writing you so that you will have some additional information concerning my Aunt's investment.

Her full name is Hazel Money Cowan and her social security number is 410–05–6777. Her address is 623 Goshen Road, Winchester, Tennessee, 37398. Please check the following information against your own books and records.

A. On or about August 29, 1994, we issued a check on behalf of Mrs. Cowan in the amount of $50,000.00.

B. On September 14, 1994, we received a check in the amount of $55,-263.44 payable to Mrs. Cowan. This amount represented principal plus return on her investment.

C. On or about September 26, 1994, you were given a check on behalf of Mrs. Cowan in the amount of $75,000.00.

D. On December 30, 1994, you disbursed a check to Mrs. Cowan in the amount of $8,484.00.

On another matter, Dudley's friends, Larry and Judy Gaggero, gave us funds in the amount of $100,000.00 to be conveyed to you for investment purposes. Mrs. Gaggero's social security number is 513–48–3007 and their address is 60122 Davie, Chapel Hill, North Carolina, 27514. I am attempting to calculate their return on investment but will still need the investment transactions prior to October 17, 1994.

These individuals would appreciate obtaining some tax documentation at your earliest convenience. Please let me know should you require further information.

(Ex. 63.)

87. Fleishman sent the following letter, dated March 30, 1995, to J. Taylor:

This is a follow up to my last letter concerning tax documentation for some of the investors. I would appreciate you issuing a K–1 to Melanie Bain. Her address is 2199 Old Salem Lexie Road, Belvidere, TN 37306. Her social security number is 409–98–7300. We deposited $10,000.00 on her behalf on October 20, 1994. It is my belief that her gain on this investment in 1994 was in the amount of $1,856.40. Accordingly, I would appreciate you preparing the tax documentation relevant to this investment.

I hope you do not have a problem with preparing this tax documentation. Otherwise, we must issue the same from our firm. Please let me know if this task presents a problem.

(Ex. 64.)

88. Fleishman received K–1s for Hazel Cowan and Melanie Bain from Taylor & Associates, L.P. (Tr. at 163.)

89. Fleishman told J. Taylor that she could not provide her aunt with a K–1 because her aunt had worked in a law office and she would know that she was not a partner. (Tr. at 165–66.)

90. J. Taylor explained that he had missed the deadline for filing 1099s, that a K–1 was the best he could give her prior to the April 15 deadline, that he would be amending whatever information he had prepared, and that her aunt would be expected to amend her return. (Tr. at 158, 166.)

91. On July 24, 1995, David Andrew (Andrew), an attorney, met with J. Taylor to prepare for a meeting J. Taylor was scheduled to have with Advanced Financial Planning. (Andrew Dep. at 7, 28.)

92. J. Taylor contacted Andrew because he had failed to include Taylor & Associates, L.P. on a form provided by Advanced Financial Planning wherein he was to list all outside investment activity or outside sources of income apart from Advanced Financial Planning. (Andrew Dep. at 39–40.)

93. J. Taylor retained Andrew to advise him whether he had any potential legal exposure, or exposure under the rules of the National Association of Securities Dealers, by reason of his failure to include Taylor & Associates, L.P. on the disclosure form. (Andrew Dep. at 40–41.)

94. In addition, questions regarding the nature of Taylor & Associates, L.P. had been raised by Advanced Financial Planning personnel. (Andrew Dep. at 8, 11, 40.)

95. Specifically, Advanced Financial Planning wanted to know whether Taylor & Associates, L.P. was a limited partnership and whether J. Taylor was selling interests in a limited partnership. (Andrew Dep. at 15–16.)

96. Knowing that D. Taylor was J. Taylor's legal counsel and that D. Taylor, as Andrew understood it, had formed Taylor & Associates, L.P., Andrew asked D. Taylor for some information regarding the

legal nature of Taylor & Associates, L.P. (Andrew Dep. at 7–8; Tr. at 372.)

97. Andrew thereafter received a Memorandum dated July 24, 1995, addressed to "Joe Taylor, Dave Andrew and File" from "Dudley W. Taylor, Esquire." The heading of the July 24, 1995 Memorandum references the subject of "Taylor & Associates." (Andrew Dep. at 8; Ex. 1 to Andrew Dep.)

98. The July 24, 1995 Memorandum received by Andrew provides in full:

I offer the following brief history of the origin and use of this Limited Partnership. In late 1993, Joe Taylor was approached by the principals and accountant of Valley Medical Systems, Inc. ("Valley") about making an investment. Valley was a newly formed durable medical equipment company that had great potential, according to its principals and their accountant.

Joe subsequently decided to make the investment, and it was concluded that he would use a limited partnership with the name of Taylor & Associates, L.P. ("TALP"). The Certificate of Limited Partnership was prepared and submitted to the Secretary of State for filing. It was promptly rejected because of the similarity of this name to Joe's corporation, Taylor & Associates, Inc.. [sic] The Certificate was returned to the Secretary of State for filing, along with a Supplementary Affidavit and other information. It was again rejected without any acknowledgment of the additional information.

I then wrote to Brook Thompson, Technical Director for the Office of the Secretary of State, explaining this situation. There was no response from Brook and from our review of the file yesterday, we concluded that no Certificate of Limited Partnership has ever been filed for this entity. Accordingly, it is not a limited partnership.

The investment in Valley proved to be disastrous. This was evident fairly soon following Joe's investment and in the last few months, the investment has been liquidated. There were no investors in Valley other than Joe, at least insofar as any investment was made through TALP.

In the late Summer and early Fall of 1994, I had a friend and client approach me about the potential for acquiring some assets at a significant discount from current value. This client had previously had a business relationship with a company controlled by two gentlemen who were also lovers. One of them died three years ago (from complications of AIDS) and in his Will, he left everything to his surviving partner. The family contested the Will and the business activities have essentially operated under hired management with no direction, for the three years since that time. My client felt that it was quite possible that we could cherry pick among those businesses and other assets, since the estate and its representatives and the surviving partner and his representatives were so caught up in emotional litigation that they were unable to deal properly with these assets. Moreover, there were large tax liabilities owing by both the estate and the surviving partner, as a result of a gain realized three years ago. The collective tax liabilities, with accrued interest and penalties now approaches $4,000,000.00.

The potential seemed wonderful based on the information provided to me. The difficulty is that my client could not be disclosed as having any interest in the purchase, or we could not likely have any meaningful negotiations. Again, personalities appeared to play a much greater role than business factors and financial factors.

My client felt that I could not be the front man for initiating negotiations with the estate and the surviving partner, because of my known affiliation with this client. The client preferred that we get someone who would not have that affiliation and Joe Taylor appeared to be an

obvious choice. I then put Joe and the client together and since that time, we have made several proposals to acquire assets ranging from shopping malls to a corporation which controls a magnificent estate in Jamaica. It is a difficult and tedious negotiation, because we must not only deal with the estate and its representatives and the surviving partner and his representatives, but also the Internal Revenue Service which has liens on all assets of the estate and the surviving partner.

At the time we began the discussions as to acquiring assets from the estate and surviving partner, there were no persons having any involvement or even any knowledge other than Joe, the client referred to above, Lori Fleishman (my law and investment partner) and me. Lori and I had subsequent discussions with other family members and close friends, who were excited at the potential gain in this situation. While continuing our negotiation for the acquisition of the assets described above, we occasionally ran across other short term investment opportunities, consisting in good part of making temporary and/or bridge type loans to clients. These are situations where the clients needed the funds more quickly than commercial sources could readily provide, and they were willing to pay a significant premium for this short term assistance. These situations have been exceedingly lucrative particularly for Lori and me along with the Campbells and one other close friend/client.

Although I have not attempted an accounting, it seems fairly clear that the bulk of the funds used for the above purposes were provided by Lori and me along with the other two clients described above. We each had family members and friends who also put money in on occasion, and to my knowledge, the funds were transmitted in each instance directly to us, either by overnighting cashiers checks or through direct wire transfers into our trust account.

We subsequently utilized TALP for tax reporting purposes for the above activities, somewhat by default. Certain of the loans were actually made in other names, including Phoenix Phynance Trust, and I believe at least one was made in the name of Taylor and Fleishman. We did not have tax numbers for these other entities, while TALP has had a tax number since late 1993 or early 1994.

Most of the persons that were involved in the above activity have obtained extensions for the filing of returns, because the accountants have not yet been able to provide the tax return, or even a complete accounting. We had one family member, however, who is an elderly lady and who simply would not hear of delaying the filing of her return. In order to keep the peace in the family we put together a K–1 on the basis of estimated information, with a clear warning to her that upon preparation of the tax return by the accountants, she may be required to file an amended return, based of course, on whether there is any material variance in the estimated information on the K–1 and the final K–1 information as prepared by the accountants.

I have reviewed the list of persons who contributed or loaned funds for the purposes described above. They are all family members or friends/clients with the exception of two persons, that being Mr. Adams and Mr. Goodfriend. Quite frankly, I had forgotten about them putting up any funds for the above purposes, although Lori was always much more aware than me as to who contributed and how much. I do remember, however, putting together two additional limited partnerships for prospective use by Joe's clients, and these were formed under the names of Prosperity Investments, L.P. and Serenity Investments, L.P. Although the partnerships were

formally organized through the filing and recording of a Certificate of Limited Partnership, they have not been utilized to my knowledge. I do definitely recall, however, that one of them was intended for use by Mr. Goodfriend who had an interest in acquiring other businesses, both in the local area and throughout the Southeast. It may be that the second was formed for a similar purpose for Mr. Adams but I cannot positively say that. It is my recollection that Mr. Adams is a life long friend of Joe Taylor but I really do not know much more about him than that.

In summary, TALP was initially created for the purpose of making an investment by Joe Taylor, alone, with no other persons to have an ownership. It was subsequently used by other investors, all sophisticated at least in the sense of making their own business and investment decisions and all having substantial business and investment experience, and was operated essentially as a[sic] investment club. The effort to organize the entity as a limited partnership was unsuccessful, and accordingly, it can be viewed only as a general partnership, for investment purposes. I am not aware of Joe soliciting any investors for this partnership and he certainly had no control over it. If anyone had control over it as actually used, it was me or

Lori Fleishman, or in particular, the two of us together. The fact is that any contributions or loans were made purely on a voluntary basis and with each person having the right to withdraw his or her investment in full or in part, at any time, upon reasonable advance notice.

In reflecting on what I have set out above, I do not believe that I have any objection to providing a copy of this memorandum to the Advance Financial Planning people in Nashville, if you choose. The one thing that I cannot and will not do is to disclose the name of the client who first approached me about purchasing the assets from the estate and the decedent's surviving partner. That would be a most severe breach of the attorney client privilege, and I remind Joe that he is not to disclose the identity of that client, under any circumstances.

(Ex. 1 to Ex. 75.)

99. D. Taylor prepared the July 24, 1995 Memorandum in its entirety.[15]

100. D. Taylor sent the July 24, 1995 Memorandum to Andrew.[16]

101. In addition to the July 24, 1995 Memorandum, both D. Taylor and J. Taylor told Andrew that Taylor & Associates, L.P. was a partnership comprised of indi-

---

**15.** D. Taylor testified that, in response to the request of Andrew, he dictated a memorandum to try to create some argument that J. Taylor, doing business as Taylor & Associates, L.P., was not a sole proprietorship but a general partnership. (Tr. at 371.) According to D. Taylor, the July 24, 1995 Memorandum received by Andrew represents, for the most part, what D. Taylor dictated but contains some information that was not included in his dictation. (Tr. at 368.) D. Taylor testified that he did not dictate the second to last sentence in the second to last paragraph. (Tr. at 370–71.) However, D. Taylor admitted that he previously filed an affidavit in which he admitted to preparing the July 24, 1995 Memorandum. (Tr. at 426–27.) Moreover, D. Taylor testified in a December 19, 1995 deposition that he prepared the July 24, 1995 Memorandum, but only for internal use. (Tr. at 430.) For these reasons, the court does not

find D. Taylor's testimony on this point to be credible.

**16.** D. Taylor testified that he never sent the July 24, 1995 Memorandum to Andrew. (Tr. at 428–29.) Moreover, D. Taylor testified that he never sent the alleged memorandum that he dictated to anyone. (Tr. at 369.) According to D. Taylor, he destroyed his dictated memorandum after reading a draft copy of it and never saw anything resembling his memorandum until after the death of J. Taylor. (Tr. at 369.) In the December 19, 1995 deposition, however, D. Taylor testified that he could not say for sure that he didn't send the July 24, 1995 Memorandum to Andrew. (Tr. at 429–30.) Again, the court does not find D. Taylor's testimony on this point to be credible.

viduals who jointly invested in real estate and other businesses. (Andrew Dep. at 9.)

102. D. Taylor told Andrew that D. Taylor was a partner in Taylor & Associates, L.P. along with J. Taylor and others.[17] (Andrew Dep. at 28–29.)

103. Andrew never saw a written partnership agreement concerning Taylor & Associates, L.P. (Andrew Dep. at 38.)

104. At the meeting with Advanced Financial Planning, J. Taylor described Taylor & Associates, L.P. as a general partnership in which he was a partner and investor. (Andrew Dep. at 17.)

105. J. Taylor further represented to Advanced Financial Planning that D. Taylor was a partner in Taylor & Associates, L.P., but did not identify any other partners. (Andrew Dep. at 17.)

106. On the day following the meeting between J. Taylor and Advanced Financial Planning, Andrew, in response to a request from the compliance officer at Advanced Financial Planning, prepared a short letter for D. Taylor to sign confirming the nature of Taylor & Associates, L.P. as a general partnership. (Andrew Dep. at 18.)

107. Andrew notified D. Taylor that he was drafting the letter and D. Taylor informed Andrew that he was in agreement.[18] (Andrew Dep. at 18.)

108. D. Taylor wrote a letter, dated October 19, 1995, regarding Laurel Knuckles Seaton (L. Seaton) that was addressed to Robert L. Crossley, Esquire, the attorney who represented L. Seaton. (Tr. at 400–02, 458–59.)

109. The October 19, 1995 letter provides in full:

I am enclosing a cashier's check in the amount of $212,298.00. The remitter is Joe Taylor, and the enclosed sum represents the entire account balance of Laurel's investment through Joe. He made this disbursement at my request.

Joe has been in the investment business for a long while in this area, and he deals with a wide variety of clients. I am certain that I would not even know many of his clients.

On the other hand, a few of my friends and clients have invested with Joe from time to time in what is essentially an investment club arrangement. If one of us comes up with an idea, then we share it with the group and each person is free to participate as he or she sees fit, based on the size of the investment.

The funds invested by Laurel were invested under this arrangement, as I understand it. I at least know that we introduced Ken Seaton to Joe Taylor, and Laurel gained Joe's acquaintance in the same fashion.

We have tried to avoid controversy and friction, and we have done a darn good job of that so far. Although we hope to make money through our investments, we also look to have fun based on an amicable relationship among the participants.

I respectfully submit that these divorce proceedings have at least temporarily obviated any possibility of an amicable and rather free-wheeling investment arrangement, insofar as par-

17. D. Taylor testified that he never told Andrew that Taylor & Associates, L.P. was a general partnership or that D. Taylor was a general partner. (Tr. at 372–73.) D. Taylor testified that he only told Andrew that he and J. Taylor were looking at some real estate ventures and that if they found one that was suitable, they might organize it as a partnership. (Tr. at 372–73.) The court is persuaded that the testimony of Andrew is more credible than that of D. Taylor on this point of conflicting proof and finds that D. Taylor did tell Andrew that Taylor & Associates, L.P. was a partnership and that D. Taylor was a general partner.

18. D. Taylor testified that Andrew never asked him to prepare a document that reflected that he was a general partner in a partnership known as Taylor & Associates, L.P. (Tr. at 372.) Again, the court finds the testimony of Andrew to be more credible on this point of conflicting proof.

ticipation by Laurel and Ken are concerned. I advanced this idea to Joe and as noted above, requested that he close out any investments that Ken and Laurel may have through our investment club. Joe concurred and acceded to the request resulting in the transmittal to you of the enclosed funds.

It may be that when this litigation is finally concluded, Ken and Laurel can each resume their investment activities through Joe, even if not through our investment club. I understand from Joe that he has enjoyed working with Ken and Laurel and we all are anguished at these rather messy proceedings.[19]

(Ex. 67.)

110. D. Taylor sent J. Taylor a letter, dated October 26, 1995. (Tr. at 384.)

111. The October 26, 1995 letter provides in full:

This is to confirm that we delivered two cashier's checks to you on Wednesday, October 25, 1995, in the respective amounts of $250,000.00 and $25,000.00. These funds were to be invested in some unnamed investment that would close out and have good funds available for return on Monday, October 30, 1995.

This is to further confirm in writing that we requested that our participation in that transaction be returned to us on Monday, or soon thereafter as reasonably practical, including both invested principal and any gain on the transaction. Obviously, that distributate [sic] would be after a deduction for our share of any and all expenses, whether paid to third parties or in the form of a commission to you.

If I have misstated anything about our understanding on this arrangement, then please let me know immediately.[20]

---

19. D. Taylor's testimony concerning the October 19, 1995 letter is, to say the very least, conflicting. The letter clearly establishes that D. Taylor sent a cashier's check, the remitter of the check being J. Taylor, to L. Seaton which represented "the entire account balance of Laurel's investment through Joe." The letter also makes it clear that "the funds invested by Laurel were invested under" "what is essentially an investment club arrangement." However, when questioned about the letter's reference to an investment club, D. Taylor explained that the investment club to which he was referring was unrelated to J. Taylor. D. Taylor testified that in 1994 and 1995 he and Fleishman, along with some other people, invested in certain ventures unrelated to J. Taylor. (Tr. at 400.) In October 1995, this group was considering an investment in a parcel of lake side property that one of D. Taylor's clients possessed an option on. (Tr. at 401.) These investors discussed the possibility of J. Taylor's participation in this investment, but J. Taylor's participation never materialized. (Tr. at 401.) D. Taylor testified that J. Taylor told him that L. Seaton made it known that she intended to participate in the lake side investment. (Tr. at 401.) According to D. Taylor, the investments that he referred to in the October 19, 1995 letter had nothing to do with the buying and selling of securities through J. Taylor. (Tr. at 403.)

If such is the case, then one wonders why L. Seaton was receiving a cashier's check from J. Taylor and why the October 19, 1995 letter represents that the proceeds of the check constitute the outstanding balance of L. Seaton's "investment through Joe." D. Taylor provided an explanation. The court, however, does not find it to be persuasive. According to D. Taylor, J. Taylor told him that J. Taylor, who handled certain investments for L. Seaton, did not want to be in the middle of an emotional divorce that L. Seaton was involved in and that J. Taylor wanted D. Taylor to write a letter to L. Seaton's attorney to get J. Taylor out of the situation. (Tr. at 402.) This testimony stands in conflict with D. Taylor's testimony on cross-examination that L. Seaton was not getting her money back from the lake side investors but from her investments with J. Taylor. (Tr. at 464.) Moreover, this testimony also conflicts with the plain language of the October 19, 1995 letter wherein D. Taylor made it clear that he initiated the closing of L. Seaton's account with J. Taylor, who "acceded to the request." D. Taylor, on cross-examination, was caught in his conflicting testimony:

Q. On the fourth paragraph, first sentence, you say, "The funds invested by Laurel were invested under this arrangement." Were you not talking about that investment club?

A. No, sir.

Q. What kind of arrangement were you talking about?

A. I have no idea . . . .

(Tr. at 465.) Accordingly, the court gives no weight to D. Taylor's explanation of the October 19, 1995 letter and finds that the letter speaks for itself.

(Ex. 69.)

112. D. Taylor sent a letter, dated October 31, 1995, to J. Taylor. (Tr. at 386–87.)

113. The October 31, 1995 letter provides in full:

Thank you for meeting with Lori yesterday afternoon and providing some updated information. I had my own hands full last evening, but she left some messages for me and I have now spoken briefly with her this morning as she travels west.

I also understand from my discussion with you by telephone yesterday that the transaction did cash out on Monday as to which we provided $275,000 last week. Lori told me that the return was 50%, so I assume that the principal and investment return is $412,500. I have some concern as to whether this allows expenses and an appropriate commission for you or others involved in this, but I have at least prepared a check in the amount of $412,500 to deposit to our account, if everything is okay. I will enclose a photocopy of the check, but it will not be deposited until I hear back from you or Sherry.

By the way, my plans are to deposit it here in my firm account at First Knoxville Bank. I need to pay First Knoxville $200,000, and in fact should have paid them that sum on or about October 22, 1995. But I assume that it will be Wednesday at the earliest before there is a clearing transaction with your bank.

Joe, Lori also told me that there was a bond deal that you got stuck with. I insist that we at least share that with you. With the growth in our account that you have produced for us, I would more than welcome the opportunity to take the entire balance of that investment and then take whatever losses are associated with it.

I remain indebted to you and perhaps even in awe of you.

(Ex. 70.)

114. D. Taylor was led to believe that J. Taylor had purchased over $6,000,000.00 of worthless bonds. (Tr. at 387.)

115. D. Taylor explained that he offered to share the loss because he thought that it would help him close his account with J. Taylor and because he felt sorry for J. Taylor. (Tr. at 387–88.)

116. D. Taylor testified that he never thought that he was obligated to share in J. Taylor's loss. (Tr. at 388.)

117. On at least one occasion J. Taylor gave D. Taylor blank checks from an account entitled Taylor & Associates, L.P. that D. Taylor later completed. (Tr. at 188–89, 456–57.)

118. Apart from her family members, D. Taylor, and a family by the name of the Campbells, Fleishman was not aware of other people investing with J. Taylor during the time that she invested with J. Taylor. (Tr. at 292.)

119. J. Taylor never asked Fleishman to be a partner. (Tr. at 293.)

120. Fleishman never agreed to be a partner. (Tr. at 294.)

121. Fleishman never signed a partnership agreement with J. Taylor. (Tr. at 294.)

122. D. Taylor thought that he was investing with J. Taylor as a broker. (Tr. at 452.)

123. D. Taylor never agreed to be a partner with J. Taylor in any venture concerning securities. (Tr. at 355.)

124. J. Taylor never asked D. Taylor to be a partner. (Tr. at 355.)

---

20. D. Taylor testified that the reference to "our share" of expenses in no way references an agreement to share in the expenses of a partnership. (Tr. at 386.) D. Taylor testified that this was simply a reference to himself and Fleishman. (Tr. at 454.)

125. D. Taylor never signed a partnership agreement with J. Taylor. (Tr. at 355.)

126. D. Taylor testified that there were individuals who became aware of J. Taylor through him. (Tr. at 490.)

127. D. Taylor told Mary Lynn Ratcliff of the possibility of investing in bonds through J. Taylor. (Tr. at 490.)

128. Mary Lynn Ratcliff made an investment with J. Taylor by making a check payable to D. Taylor. (Tr. at 490.)

129. James Ed Rice, Sr. and James Ed Rice, Jr., who did not know J. Taylor, invested with J. Taylor by wiring funds to the trust account of D. Taylor's law firm. (Tr. at 454–55, 491.)

130. Steve Chase invested with J. Taylor by wiring funds to the trust account of D. Taylor's law firm. (Tr. at 491.)

131. Larry Gaggero invested with J. Taylor after placing investment funds in the trust account of D. Taylor's law firm and later directing D. Taylor to transmit the funds to J. Taylor. (Tr. at 155–56, 492.)

132. Hazel Cowan, who had never met J. Taylor, wired $50,000.00 to Fleishman's personal bank account and Fleishman thereafter delivered the funds to J. Taylor for investment. (Tr. at 155.)

133. J. Taylor never asked D. Taylor to solicit investors for him. (Tr. at 360.)

## III

### Taylor & Associates, L.P. as a Limited Partnership

■ The district court, after examining the law of limited partnerships in Tennessee, reached the following conclusion:

An analysis of [the Tennessee Revised Uniform Limited Partnership Act] reveals [that] people wanting to form a limited partnership cannot just stumble into one. The statutory requirements for becoming a limited partner are significant; the benefit of limited liability exacts a price. "Generally, limited partnerships are creatures of statute, and statutory compliance establishes their existence."

*Taylor & Assocs., L.P.,* 249 B.R. at 443 (quoting *Hayes v. FPI Nursery Partners 1984–I,* No. 90–15224, 1991 WL 103447, at *3 (9th Cir. June 11, 1991)). Accordingly, this court must examine the record to determine if the petitioners have presented sufficient proof of the statutory requisites of a limited partnership.

### A. Certificate of Limited Partnership

■ In Tennessee, the creation of a limited partnership is dependent upon the proper execution and filing of a certificate of limited partnership. *See* Tenn.Code Ann. § 61–2–201 (1989). The district court concluded that the Certificate of Limited Partnership of Taylor and Associates, L.P. that was prepared by D. Taylor in anticipation of the J. Taylor/Buchheit investment in Valley Medical was applicable only to the J. Taylor/Buchheit context and not to other contexts, such as the J. Taylor solicitation of investors context. *See Taylor & Assocs., L.P.,* 249 B.R. at 444–45. Because the petitioners, at the December 1–2, 1997 trial, did not present proof of any certificate of limited partnership concerning Taylor & Associates, L.P., other than that prepared in contemplation of the investment in Valley Medical, the statutory requisites of a limited partnership can only be found to exist within the J. Taylor/Buchheit context.

### B. Identifiable Limited Partner

■ A second requirement concerning the creation of a limited partnership, dictated by the statutory definition of a limited partnership, is the existence of one or more limited partners. *See* Tenn.Code Ann. § 61–2–101(8) (1989). Within the J. Taylor/Buchheit context, being the only context in which a limited partnership could possibly exist given

the absence of a certificate of limited partnership in other contexts, the proof establishes that J. Taylor was, if a partner at all, a general partner. Within this same context, there is no proof that anyone other than Buchheit even contemplated becoming a partner with J. Taylor for the purpose of investing in Valley Medical. Therefore, unless Buchheit can be characterized as a limited partner, the entity referred to as Taylor & Associates, L.P. is not a limited partnership. The record is clear that Buchheit never invested in Valley Medical and never agreed to form a partnership with J. Taylor.[21] Consequently, there is no limited partnership known as Taylor & Associates, L.P. because there is no proof of a limited partner within the only context for which a certificate of limited partnership exists.

### C. Partnership Agreement

■ A third statutory requirement of a limited partnership is a partnership agreement, though the agreement need not be in writing. *Taylor & Assocs., L.P.*, 249 B.R. at 442–43. It is not necessary for the court to address this issue given that there is no proof of a limited partner within the only context in which a certificate of partnership was properly executed and filed. However, because a partnership agreement is also a requirement of a general partnership, the court will address this issue within that context.

### IV

### Taylor & Associates, L.P. as a General Partnership

■ A general partnership "is an association of two (2) or more persons to carry on as coowners a business for profit." Tenn.Code Ann. § 61–1–105 (Supp. 1995). "While it is clear [that] establishing the existence of a partnership is a less rigid process than for a limited partnership, there must still be sufficient evidence of 'the intent to do the things which constitute a partnership.'" *Taylor & Assocs., L.P.*, 249 B.R. at 446–47 (quoting *Bass v. Bass*, 814 S.W.2d 38, 41 (Tenn.1991)). In particular,

> Tennessee courts have analyzed whether a partnership agreement exists in light of contract law.... "[W]hile it is not essential that ... [contracts of partnership] be in writing, nevertheless, when an oral contract is sought to be enforced the [triers] of fact are required to carefully scrutinize and weigh the evidence, and should be satisfied of its existence by clear and convincing proof." *Wheeler v. Haley*, No. 91–267–I, 1993 WL 398489, at p. *4 (Tenn.Ct.App. Oct.1, 1993) (citation omitted). "To be an enforceable contract it must, among other elements, result from a meeting of the minds in mutual assent to terms, must be based upon sufficient consideration, and must be sufficiently definite." *Id.* at p. *5 (citations omitted).

*Taylor & Assocs., L.P.*, 249 B.R. at 246–47. The Supreme Court of Tennessee, in *Bass*, elaborated upon this contract standard:

> [T]he existence of a partnership depends upon the intention of the parties ... [as] ascertainable from the acts of the parties.... [A] contract of partnership, either express or implied, is essential to the creation of partnership status .... The existence of a partnership is not a question of the parties' undisclosed intention or even the terminology they use to describe their relationship, nor is it necessary that the parties have an understanding of the legal effect of their acts. It is the intent to do the things which constitute a partnership that determines whether individuals are partners .... [T]he existence of a part-

---

21. The district court concluded that there were no limited partners within the J. Taylor/Buchheit context because Buchheit opted not to invest in the Valley Medical deal. *Taylor & Assocs., L.P.*, 249 B.R. at 443–44. The petitioners failed to present any additional evidence on this issue at the December 1–2, 1997 trial.

nership may be implied from the circumstances where it appears that the individuals involved have entered into a business relationship for profit, combining their property, labor, skill, experience, or money.

*Bass*, 814 S.W.2d at 41 (citations and footnote omitted).

■■■■ The petitioners failed to proffer evidence of a written partnership contract within any of the contexts defined by the district court or within any other context.[22] Therefore, if an express contract of partnership is to be found the record must establish, by clear and convincing evidence, the existence of an oral contract of partnership evidenced by mutual assent to sufficiently definite terms that is supported by valid consideration. The clear and convincing evidence standard requires that there be no serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *Ingram v. State Industries, Inc.*, 943 S.W.2d 381, 383 (1995); *Middleton v. Allegheny Elec. Co., Inc.*, 897 S.W.2d 695, 697–98 (1995). However, even if there is not sufficient proof of such an oral contract, "the existence of a partnership may be implied from the circumstances where it appears that the individuals involved have entered into a business relationship for profit, combining their property, labor, skill, experience, or money."[23] *Bass*, 814 S.W.2d at 41.

A. J. Taylor/Buchheit Attempt to Form Limited Partnership and J. Taylor's Solo Investment in Valley Medical

The record is void of proof relating to the elements of an oral contract within the following contexts: (1) the J. Taylor/Buchheit attempt to form a limited partnership; and (2) J. Taylor's solo investment in Valley Medical. In both of these contexts, there is no evidence that J. Taylor entered into an oral agreement with anyone to carry on a business for profit as co-owners. Moreover, with respect to an implied partnership, in neither of these contexts is there proof that individuals entered into a business relationship for profit, combining their property, labor, skill, experience, or money. The record establishes that within these two contexts J. Taylor acted alone in his endeavors under the name of Taylor & Associates, L.P.

B. J. Taylor's Solicitation of Investors Through Taylor & Associates, L.P.

■■■ As to the context in which J. Taylor solicited investors through Taylor & Associates, L.P., the court possesses serious and substantial doubts as to whether the petitioners have established the elements of an oral contract. J. Taylor told Elkins and Claiborne that they were partners. However, there is no evidence that these individuals agreed to enter into a partnership with J. Taylor.[24] The record further reflects that Rogers and Gilley, based upon their receipt of K–1s and other circumstantial factors, came to the conclusion that they were partners. However, the district court made it clear that an individual's belief that he or she is a partner does not constitute mutual assent to such a characterization.[25] *Taylor & Assocs., L.P.*, 249 B.R. at 444–45. According-

---

22. The record establishes that D. Taylor prepared a draft partnership agreement for the potential J. Taylor/Buchheit investment in Valley Medical but this agreement was not signed by either J. Taylor or Buchheit.

23. The Tennessee Supreme Court, in *Bass*, noted: " 'The intent of parties to form a partnership may be implied; it need not be expressed in writing or orally, if it can be derived from the parties' actions.' " *Bass*, 814 S.W.2d at 41 n. 3 (quoting 59A AM. JUR.2d *Partnerships* § 152 (1987)).

24. J. Taylor told Claiborne that he was a limited partner as opposed to a general partner. Accordingly, even if Claiborne mutually assented to being characterized as a partner, there is no evidence of mutual assent as to Claiborne being characterized as a general partner.

25. Even if these individuals did assent to being a partner, the record establishes that they believed that they were limited, as opposed to general, partners.

ly, the petitioners have not proffered clear and convincing evidence of an oral contract of partnership in regard to the context in which J. Taylor solicited investors through Taylor & Associates, L.P.

The court also concludes that, within the context of J. Taylor's solicitation of investors through Taylor & Associates, L.P., there is insufficient proof to find the existence of an implied contract of partnership. First, with respect to this context, the petitioners have proffered little additional evidence that was not already before the district court when it concluded that "J. Taylor, in this third context, acted more like a securities brokerage firm than a limited partnership." *Id.*, 249 B.R. at 445. Second, in outlining the elements of an implied partnership, the Supreme Court of Tennessee noted that not only must there be proof that money, skills, or labor was combined but there also must be evidence that this was done "with the understanding that profits will be shared." *Bass*, 814 S.W.2d at 41. The evidence must establish that the individuals who combined their resources "entered into a business relationship." *Id.* The record before the court does not support such a finding.

As to whether resources were actually combined, regardless of the intent of the parties, there is little evidence other than the tax documentation entered into the record which represents that resources were combined and profits shared. However, there is no proof that this combining of resources was accomplished by means of entering into a business relationship whereby it was understood that profits would be shared. The record contains absolutely no evidence of the understanding of the following individuals with regard to the sharing of profits and losses: Robert Fannon, Jerry Hill, Ronald Mabry, Vickie Mabry, Don Poteet, Claiborne, Bush, Rogers, Gilley, and Gamble. Elkins is the only investor within this third context for which the record establishes such an understanding. In this respect, the record is clear that Elkins did not agree to share his investments or returns and he did not expect to share in the returns of others who invested with J. Taylor. Accordingly, regardless of whether investment funds were actually combined, there is no proof of an implied partnership within this third context because there is no proof that the individuals whose funds may have been combined entered into a business relationship based upon the understanding that profits from such a joinder of assets would be shared.

## C.D. Taylor/Fleishman Involvement Regarding Investment Projects

J. Taylor and D. Taylor both represented that they were partners of Taylor & Associates, L.P. D. Taylor told Andrew that he was a partner in Taylor & Associates, L.P. along with J. Taylor. J. Taylor informed Advanced Financial Planning that he and D. Taylor were partners of Taylor & Associates, L.P. Following J. Taylor's meeting with Advanced Financial Planning, Andrew notified D. Taylor that he was drafting a letter for D. Taylor to sign that confirmed the status of Taylor & Associates, L.P. as a general partnership. D. Taylor agreed to such a representation. Nevertheless, such evidence does not establish the required mutual assent to establish an oral partnership contract because these representations were not communicated amongst the parties to the alleged contract. *See* 17A AM. JUR. 2D *Contracts* § 27 (1991) ("[F]or a contract to be binding, the parties thereto must have a distinct and common intention which is communicated by each party to the other."); 17A AM. JUR. 2D *Contracts* § 28 (1991) ("Mutual assent which is essential to the formation of a binding contract must be manifested by one party to the other."). Because the record does not establish that J. Taylor and D. Taylor made these communications to each other, the petitioners have failed to establish by

clear and convincing evidence the existence of an oral contract of partnership.

Although there is no express contract of partnership within the D. Taylor/Fleishman investment context, there is a good deal of evidence supporting the existence of an implied partnership within this context. The July 24, 1995 Memorandum that D. Taylor sent to Andrew provides compelling evidence of an understanding among individuals to share profits generated through the pooling of their resources. The most pertinent portions of the July 24, 1995 Memorandum provide as follows:

> In the late Summer and early Fall of 1994, I had a friend and client approach me about the potential for acquiring some assets at a significant discount from current value....
>
> ....
>
> ... I then put Joe and the client together and since that time, we have made several proposals to acquire assets ranging from shopping malls to a corporation which controls a magnificent estate in Jamaica....
>
> At the time we began the discussions as to acquiring assets ... there were no persons having any involvement or even any knowledge other than Joe, the client referred to above, Lori Fleishman (my law and investment partner) and me. Lori and I had subsequent discussions with other family members and close friends, who were excited at the potential gain in this situation. While continuing our negotiation for the acquisition of the assets described above, we occasionally ran across other short term investment opportunities, consisting in good part of making temporary and/or bridge type loans to clients. These are situations where the clients needed the funds more quickly than commercial sources could readily provide, and they were willing to pay a significant premium for this short term assistance. These situations have been exceedingly lucrative particularly for Lori and me

> along with the Campbells and one other close friend/client.
>
> ... [I]t seems fairly clear that the bulk of the funds used for the above purposes were provided by Lori and me along with the other two clients described above. We each had family members and friends who also put money in on occasion ....
>
> We subsequently utilized TALP for tax reporting purposes for the above activities, somewhat by default. Certain of the loans were actually made in other names .... We did not have tax numbers for these other entities, while TALP has had a tax number since late 1993 or early 1994.
>
> ....
>
> I have reviewed the list of persons who contributed or loaned funds for the purposes described above. They are all family members or friends/clients with the exception of two persons, that being Mr. Adams and Mr. Goodfriend. Quite frankly, I had forgotten about them putting up any funds for the above purposes ....
>
> In summary, TALP ... was operated essentially as a[sic] investment club.... If anyone had control over it as actually used, it was me or Lori Fleishman, or in particular, the two of us together. The fact is that any contributions or loans were made purely on a voluntary basis and with each person having the right to withdraw his or her investment in full or in part, at any time, upon reasonable advance notice.

The July 24, 1995 Memorandum is wholly consistent with the representation that both D. Taylor and J. Taylor made to Andrew that Taylor & Associates, L.P. was a partnership comprised of individuals who jointly invested in real estate and other businesses.

Further evidence of a combining of assets for profit is found in D. Taylor's October 19, 1995 letter to Robert L. Crossley, wherein he states in material part:

[A] few of my friends and clients have invested with Joe from time to time in what is essentially an investment club arrangement. If one of us comes up with an idea, then we share it with the group and each person is free to participate as he or she sees fit, based on the size of the investment.

The funds invested by Laurel were invested under this arrangement ....

... Although we hope to make money through our investments, we also look to have fun based on an amicable relationship among the participants.

I respectfully submit that these divorce proceedings have at least temporarily obviated any possibility of an amicable and rather free-wheeling investment arrangement, insofar as participation by Laurel and Ken are concerned. I advanced this idea to Joe and as noted above, requested that he close out any investments that Ken and Laurel may have through our investment club....

It may be that when this litigation is finally concluded, Ken and Laurel can each resume their investment activities through Joe, even if not through our investment club....[26]

Other evidence includes the October 26, 1995 letter from D. Taylor to J. Taylor confirming that "our participation" in a certain transaction be returned by a specific date following the relevant deductions for "our share" of expenses. If D. Taylor wasn't pooling assets for the sake of profit, arguably, there would be no need to use such terminology.

■■■■ However, even if the record establishes the combining of resources for profit within the fourth context identified by the district court, a finding that this court need not reach,[27] there remains a problem for the petitioners that was highlighted by the district court, which stated:

Whether a general partnership existed would rest upon consideration of precisely who were the partners, when exactly was the partnership formed, how long did the partnership last, was it dissolved by the withdrawal of partners, and what was the purpose of the partnership. Complicating the analysis here to some degree is that [the] appellee, in arguing the continuous existence of one partnership, concedes that withdrawal of

**26.** The following is an excerpt from a November 13, 1997 deposition of D. Taylor:

> Q. What is your understanding of the meaning of the term "investment club"?
> A. Investment club? Well, I think of it as a form of a partnership. The only one I have ever actually seen was formed as a partnership where a group of people pool their money and they make a collective decision over what they want to invest in; they meet periodically and exchange information; they decide what they want to invest generally by an affirmative vote of the majority of the folks; they typically have some assessment. I don't know if "assessment" is the proper term, but at any rate, an understanding to put in $100 apiece a month or $50 apiece a month or $200 apiece a month.
> (Ex. 73.)

**27.** Although there is persuasive evidence in the record that D. Taylor and L. Fleishman, among others, participated amongst, if not orchestrated, a group of investors who combined resources for investment and the sharing of profits, the record also contains evidence to the contrary. Fleishman testified that: (1) she thought she was investing with J. Taylor exclusively as a broker (Tr. at 292); (2) she never agreed to share investments with anyone (Tr. at 292); (3) she never agreed to share in profits or losses in any of J. Taylor's investments with anyone else (Tr. at 294); (4) she had no control over which individuals invested with J. Taylor (Tr. at 294); and (5) she never recommended or suggested that anyone invest with J. Taylor (Tr. at 294). D. Taylor testified that: (1) he did not have any control over which people invested with J. Taylor (Tr. at 355); (2) he never discussed his investments with J. Taylor with any other person who was investing with J. Taylor (Tr. at 356–59); (3) he never suggested that anyone else invest with J. Taylor (Tr. at 360); (4) with the exception of Fleishman, no one ever asked him to share in their investments with J. Taylor (Tr. at 360); and (5) he and his law firm never shared their investments with anyone else (Tr. at 360–61).

one partner operates to dissolve the partnership. Another complication is the legal significance of additional partners joining an existing partnership.

The record below is insufficient to allow the Court to conclude a general partnership formed and consisted of particular individuals at any precise time.

*Taylor & Assocs., L.P.,* 249 B.R. at 446–47. It has long been settled in Tennessee that the addition of a partner to, or the removal of a partner from, a partnership dissolves the partnership that existed prior to the addition or removal, and if the business continues, creates a new partnership. *Nicholson v. Kinsey,* 38 S.W. 1033, 1037 (Tenn.1896) (citing *Bank v. Andrews,* 34 Tenn. 535 (1855)). The record in this case is clear that the individuals that participated in certain investments with D. Taylor and Fleishman possessed "the right to withdraw his or her investment in full or in part, at any time." *See* Ex. 1 to Ex. 75; *see also* Ex. 67 (stating that "each person is free to participate as he or she sees fit, based on the size of the investment"). Assuming the existence of a partnership or partnerships, the petitioners have failed to establish exactly which individuals were partners with D. Taylor and Fleishman at any particular point in time. They simply made the general allegation that a partnership existed without defining the parameters of the partnership that they refer to.[28] This is problematic in that there quite possibly could have been a number of partnerships given the "free-wheeling investment arrangement" established by D. Taylor and other interested parties. *See* Ex.

67. Moreover, as the district court noted, different partnerships may have existed for different purposes. D. Taylor's October 19, 1995 letter to L. Seaton's attorney suggests that an investment club existed for investment purposes with J. Taylor. However, D. Taylor's July 24, 1995 Memorandum to Andrew suggests that an investment club existed for the purpose of acquiring assets and making temporary or bridge loans to clients. Accordingly, the petitioners have failed to establish the existence of a defined, implied partnership within the context of the various investment activities of D. Taylor and Fleishman.

**V**

In conclusion, the petitioners have failed to establish the existence of a limited or general partnership operating under the name of Taylor & Associates, L.P. Accordingly, Taylor & Associates, L.P. is not eligible to be a debtor in bankruptcy and the Involuntary Petition against Taylor & Associates, L.P. will be dismissed. An appropriate order will.be entered.

---

**28.** The court's conclusion is further confirmed by the statements of one of the attorneys for James S. Bush in argument at the close of the petitioners' proof.

  *Mr. Slatery:*

  It was an informal investment club run with people being in and out. The Andrew memorandum says that the general understanding among those people that were involved was that it would be operated as an investment club participating in an investment, it was purely voluntary, and each partner had the right to withdraw his investment in full or in part at any time upon reasonable notice. There's your agreement, Your Honor. That's your understanding right there. They can come in and out and it's an informal partnership.
(Tr. at 228.)